WESTERN PUBLISHING COMPANY, INC., Plaintiff-Appellant,

v.

LOCAL 254, GRAPHIC ARTS INTER-NATIONAL UNION, et al., Defendants-Appellees.

No. 74–1832.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1975.

Decided Sept. 4, 1975.

Certiorari Denied Jan. 26, 1976.

See 96 S.Ct. 880.

Rex Capwell, Racine, Wis., George P. Blake, Chicago, Ill., for plaintiff-appellant.

Eugene Cotton, Russell Woody, Chicago, Ill., Daniel L. Shneidman, Milwaukee, Wis., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, CUMMINGS and SPRECHER, Circuit Judges.

CASTLE, Senior Circuit Judge.

Plaintiff Western Publishing Company, Inc. filed a complaint under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, alleging that defendant Local 254, Graphic Arts International Union, and certain individual defendants who at the time of filing were officers and members of Local 254, violated the no-strike and grievance and arbitration provisions of the collective bargaining agreement when they engaged in a work stoppage by refusing to handle what the defendants claimed was struck work. The complaint sought injunctive relief, and as amended, damages. Injunctive relief was denied, and subsequently, the district court granted summary judgment in favor of the Union on the issue of damage liability,[1] concluding that there was no breach of the collective bargaining agreement. On appeal, only denial of the damage claim is before us, and we reverse and remand.

I.

Western Publishing Company is engaged in the printing and publishing

---

1. The district court had previously sustained a motion to dismiss the Company's complaint to the extent that damages were sought against the individual defendants, and that dismissal is not challenged here.

business and has plant locations at Racine, Wisconsin, and Hannibal, Missouri. On April 3, 1973 Locals 237 and 123–B, Graphic Arts International Union, representing lithographic production and bindery employees, struck the Hannibal plant. According to the Company, it began to shut down the Hannibal facility, and as a result, work scheduled at that plant had to be performed elsewhere. Work on the magazine "Easyriders" was assigned to the Racine plant, and was to commence on May 8, 1973.

Defendant Local 254 represents employees engaged in work related to lithographic printing at the Racine plant. The collective bargaining agreement between Local 254 and the Company contained no-strike and arbitration clauses.[2] It also contained provisions which prohibited the Company from requiring employees to handle struck work, and from taking disciplinary action against any employee who refused to handle such work.[3] Recognizing that there might exist a dispute as to the status of the "Ea-

syriders" work, the Company delayed production, and between May 8 and May 14 the Company and Union engaged in a series of conversations concerning assignment of that work to members of Local 254. The Company contended that "Easyriders" was not struck work, and maintained that if a question existed as to the application of the struck work provisions, the proper procedure would be to arbitrate the issue pursuant to the grievance and arbitration provisions of the contract. The Company also offered to expedite the arbitration process.

Unable to make any headway, on May 14 the Company assigned the "Easyriders" work to its employees. The Union's position was that "Easyriders" was struck work, and as a result, members of Local 254, after consultation with the Union, refused to begin work on that job. One member who had begun working on "Easyriders" that morning ceased his work after being informed by a Union department representative that "Easyriders" was struck work.[4] Further,

---

2. The relevant parts of those clauses provided:

ARTICLE 23. STRIKES AND LOCKOUTS
SECTION 1. There shall be no strikes, stoppages, slowdowns, or general concerted action to interfere with the quality and quantity of production required by the Company and its customers during the term of this contract, except as otherwise provided under this contract.

\*   \*   \*   \*   \*   \*

ARTICLE 24. GRIEVANCE PROCEDURE— ARBITRATION
SECTION 1. In the event an individual has a question or grievance, he first will go to his foreman or supervisor in order to get an answer or a satisfactory understanding.

\*   \*   \*   \*   \*   \*

SECTION 6. Should the joint committee be unable to agree within ten days, then it will refer the matter to the American Arbitration Association for arbitration under their normal procedures, provided such dispute involves interpretation of this Agreement or the failure of the parties to reach an agreement relative to any grievance coming within the provisions thereof, except wages. The decision of the arbitrator shall be final and binding on both parties, provided that local union laws not affecting wages, hours, or working conditions and the laws of the International shall not be subject to arbitration.

3. Those provisions read as follows:

ARTICLE 18. STRUCK WORK
The Company agrees that it will not render production assistance to any employer, any of whose plants is struck by any local of the Lithographers, and Photoengravers International Union or by the International, or where members of any such local or the International are locked out, by requiring the employees covered by this contract to handle any struck work farmed out directly or indirectly by such employer, other than work which the Company herein customarily has performed for the employer involved in such strike or lockout. The Union through its officers will inform or advise the Company and its membership as to struck work.

ARTICLE 20. INDIVIDUAL RIGHT OF EMPLOYEE
The Company agrees that it will not discharge, discipline or discriminate against any employee because such employee refuses to handle any work of the type described in the Struck Work clause.

4. The Union argues that it is not responsible for the work stoppage because although its members admittedly consulted with it concerning the "Easyriders" job, it did not instruct any member not to perform the work. Each member, it contends, individually elected not

the Union refused to delay its work stoppage pending the outcome of arbitration, and no member of the Union filed a grievance with repect to the assignment of the "Easyriders" work.[5] On the afternoon of May 14, the Company filed its § 301 action.

## II.

We note first what is *not* in dispute. Both parties agree that the struck work provisions form an exception to the no-strike clause. The parties also agree that what constitutes struck work is an arbitrable issue. The Company contends, however, that the members of the Union are not free to exercise the right to refuse to handle struck work until it is determined through arbitration that the work is, in fact, struck work. The Union, on the other hand, argues that the exercise of its right is not dependent upon the *prior* invocation of the arbitration procedure.

■ We do not think that the Union can exercise its right to refuse to perform struck work until the dispute over the character of the work is first resolved. Since the issue of what constitutes struck work is admittedly arbitrable, the policy of the law favoring arbitration and the peaceful resolution of labor disputes, *see Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 386, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974);

*Local 81, American Federation of Technical Engineers v. Western Electric Co.,* 508 F.2d 106, 108 (7th Cir. 1974), would not be fostered if the contract were interpreted so that the Union could direct economic force at an arbitrable issue. Although according to the Union's position arbitration would later occur, if the work was determined not to be struck work, then an unnecessary resort to force has occurred.

A similar result has been reached in *NAPA Pittsburgh Inc. v. Automotive Chauffeurs, Parts and Garage Employees, Local 926,* 502 F.2d 321 (3rd Cir.) (en banc), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974) and *Wilmington Shipping Co. v. International Longshoremen's Association, Local 1426,* 86 L.R.R.M. 2846 (4th Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). In those cases the collective bargaining agreements contained no-strike and arbitration clauses, and also exceptions to the no-strike clauses which permitted employees to refuse to cross a "primary" (*NAPA Pittsburgh*) or a "bona fide" (*Wilmington Shipping*) picket line. From the fact that in both cases the dispute as to the validity of the picket line fell within the scope of the arbitration clauses, it was concluded that exercise of the employees' right to refuse to cross the picket line must first await resolution by arbitration of the "validity" dispute.[6] Thus, the court in *Wilmington Shipping, supra,* at 2847 stated:

to work on "Easyriders". Suffice it to say that we need not blindfold ourselves to reality, and that the "consultations" here establish the responsibility of the Union.

5. The arbitration clause in the agreement is geared toward redressing employee grievances. *See* note 2 *supra.* The fact that no grievance was filed here, however, does not prevent the employer from contending that the arbitration provisions are triggered if the Union members also employ self-help. Were it otherwise, the effect of the no-strike clause could always be avoided by the Union's failure to file a grievance.

6. The text of the arbitration clause in *Wilmington Shipping* is not set forth. However, in *Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284 (7th Cir.), *petition for cert. filed,* 44

U.S.L.W. 3086 (U.S. July 11, 1975) and *Hyster Co. v. Independent Towing and Lifting Machine Association,* 519 F.2d 89 (7th Cir. 1975) we concluded that arbitration clauses with language similar to the arbitration clause in *NAPA Pittsburgh* did *not* include as an arbitrable issue refusals to cross another union's picket lines. *But compare Inland Steel Co. v. Local 1545, United Mine Workers of America,* 505 F.2d 293 (7th Cir. 1974). Consequently, we utilize *Wilmington Shipping* and *NAPA Pittsburgh* only to the extent that they also conclude that if the issue on which an exception to the no-strike clause depends *is* arbitrable under the contract, then the contract requires that arbitration must first take place. *Those cases also upheld issuance of injunctions against the unions, but that issue is not before us. See* text *infra.*

[W]hile the contract gives the longshoremen the right to respect bona fide picket lines, there is a factual dispute over the bona fides of this picket line. Everyone agrees the factual dispute is arbitrable under the contract. Until that issue is resolved in arbitration, it is an open question whether observance of the picket line is authorized by the contract.

See also *NAPA Pittsburgh, supra,* at 324.

The Union argues, however, that a conclusion that its right to refuse to perform struck work is deferred is equivalent to a destruction of that right since it would be too late to apply a decision in its favor to work already performed while awaiting the outcome of the arbitration process. The Union contends that the threat of discipline to its members would substantially inhibit invocation of the right of refusal where it was not absolutely certain that the work was struck work, and that in any event, if its interpretation of the character of the work is incorrect, any harm to the Company is compensable in damages. On balance, therefore, the Union urges that in order to preserve its right, it should be permitted to exercise it prior to a determination of the status of the work.

■ These arguments, however, are misdirected because they are addressed to equitable considerations relevant to the issue of a *Boys Markets* injunction [*Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)], rather than to a determination of whether the dispute here is first arbitrable under the contract. The Union's arguments apparently do contain the underlying assumption that we must evaluate these equitable considerations because it follows from the fact that the contract first requires arbitration that an injunction to enjoin the work stoppage automatically follows. But that is not necessarily the

case. As stated in *Boys Markets, supra,* at 253–254, 90 S.Ct. at 1594:

> Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance.

> . . . . .

> " . . . [T]he District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." (Citation omitted.)

While we note that all would be happy if the arbitration process were instantaneous, and further, that "the district court has ample authority in the exercise of its equitable powers to see to it that arbitration proceeds promptly and expeditiously," *NAPA Pittsburgh, supra,* at 324, we need not evaluate the Union's arguments since our conclusion in this damage action that the contract requires that the Union first arbitrate does not perforce mean that its right not to perform struck work is destroyed. The Union's arguments are more properly considered when the propriety of the issuance of an injunction is at stake.

We therefore find that the Union has breached the no-strike clause of the collective bargaining agreement. The Company has suffered no damage, however, unless it is also ascertained that "Easyriders" was not struck work, and therefore a job that members of the Union were required to perform. The district court did not reach that question, and consequently, we remand for a determination of that issue.

**534**

The judgment of the district court is reversed and the cause remanded for further proceedings.

Reversed and remanded.

CUMMINGS, Circuit Judge, concurs in the result.