NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

KELLER–CRESCENT COMPANY, a division of Mosler, Respondent.

No. 75–1595.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1976.

Decided Aug. 2, 1976.

---

Elliott Moore, Deputy Assoc. Gen. Counsel, Paul J. Spielberg, William M. Bernstein, Attys., N.L.R.B., Washington, D.C., for petitioner.

Thomas O. Magan, Evansville, Ind., for respondent.

Lawrence T. Zimmerman, Washington, D.C., William F. Quirk, Arlington, Va., for amicus curiae.

Before PELL and SPRECHER, Circuit Judges, and PARSONS, Chief District Judge.*

PELL, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board (Board). In issue is whether the Board properly found that the Keller-Crescent Company, a Division of Mosler (Company) violated Sections 8(a)(1) and (3) of the Act by suspending twelve employees for refusing to cross a picket line established at the plant by members of another union.

The Company manufactures cardboard containers and related products at its plant located in Evansville, Indiana. Different units of its employees are separately represented by Evansville Typographical Union No. 35 (Local 35); Local 117 of the Evansville Printing and Pressmen and Assistants Union, AFL–CIO (Pressmen); and two other unions. During the summer of 1972, contract negotiations between the Company and the Pressmen broke down, and the Pressmen called a strike commencing July 24, 1972, and terminating July 29, 1972. During that strike, members of Local 35 failed to report to work, having refused to cross the Pressmen's picket line.

* Chief Judge James B. Parsons of the United States District Court for the Northern District of Illinois is sitting by designation.

On July 22, 1972, the Friday before the beginning of the Pressmen's strike, the Company advised Local 35's Chapel Chairman Wayne Burdge that in the Company's opinion, Sections 12[1] and 13[2] of the collective-bargaining agreement prohibited Local 35 from refusing to cross the anticipated picket line of the Pressmen. Burdge talked to Local 35's President Donald Clark, who told Burdge to telephone him in the event that the Pressmen set up a picket line. On Monday July 25, Burdge observed that such a picket line had been set up and telephoned Clark, who appeared at the plant and addressed the members of Local 35 as they stood outside the Pressmen's picket line. He told them that the International expected them to live up to their contract and that he expected them to honor the contract. On the same day, the Company sent Burdge a telegram alleging that the members of Local 35 were violating Section 12 of the contract and threatening legal action.

On July 26, Clark telegraphed the Company, stating that Local 35's membership recognized the contract, characterizing the Company's threat of legal action as harrassment and intimidation, and stating that Local 35 was willing to meet with the Company to discuss the matter. On the next day, Clark again addressed the members of Local 35 who were continuing to observe the Pressmen's picket line, telling them that he had heard from the International and that the International said to honor the contract. Neither Burdge, Clark, nor any International representative during the course of the Pressmen's strike in explicit terms urged the membership to cease the sympathy strike or cross the Pressmen's picket line although at least one member testified that he understood Clark's statement to mean that "we shouldn't be standing out there on the street" and that "we should go back to work." Also during the strike, the Company sent a telegram to the Local 35 expressing its willingness to arbitrate any dispute.

After the Pressmen's strike ended on July 29, the twelve sympathy strikers returned to work. At this time the Company advised Burdge that the Company considered the strikers' refusal to cross the Pressmen's picket line to be in violation of the contract's no-strike clause, and that repercussions would follow. Shortly thereafter, the Company put into effect a one-

---

**1.** Section 12—No employee covered by this contract shall be required to cross a picket line established because of a strike by, or lockout of, any other subordinate Union of the International Typographical Union, when such strike is authorized by, or such lockout is recognized by the ITU.

**2.** JOINT STANDING COMMITTEE

Section 13—A Joint Standing Committee of two representatives each of the Employer and the Union shall be selected. It is agreed that if neither of the Union representatives is an employee of the commercial branch of the printing trade, that one member shall be selected by the Union from the employees of above-mentioned commercial branch of the trade, such member to attend all meetings of the Joint Standing Committee, but not to have power to vote on decisions. To this committee shall be referred *all disputes which may arise as to the application of and construction to be placed upon any provision of this agreement, or alleged violation thereof, which cannot be settled otherwise.* . . . The decision of the committee shall be final and binding upon both parties. Provided that the General Laws of the International Ty-

pographical Union shall not be subject to arbitration.

It is agreed that the conditions prevailing prior to any dispute shall be maintained until the Joint Standing Committee has rendered a decision as provided above except in discharge cases.

There shall be no strikes or lockouts during the term of this agreement unless either party refuses to comply with the grievance procedure as outlined hereinabove.

It is agreed that the procedures for the settlement of any disputes or grievances arising under this contract are as defined herein and that the only recourse each party may have against the other for any damages alleged to be due for any breach of this contract shall be to the Joint Standing Committee.

\* \* \* \* \* \*

Under no circumstances shall the arbitrator have the power or right to add to, subtract from, change or modify any provision of this contract. The arbitrator is authorized only to interpret the specific provision(s) of the contract, and to apply them to the specific facts of the grievances which are being arbitrated. [Emphasis supplied.]

week suspension of each sympathy striker with the exception of Burdge, who received a two-week suspension.

The Administrative Law Judge found that the employees were given a disciplinary suspension for refusing to cross the Pressmen's picket line. The ALJ further found that absent any other evidence in the record, the no-strike prohibition set forth in § 13 of the contract was inapplicable, inasmuch as the waiver of the right to strike therein was only as extensive as the scope of the grievance and arbitration procedure, which extends only to disputes which may arise as to the application and construction to be placed upon any provision of the agreement, or alleged violation thereof. He concluded that, inasmuch as the issue of the strike engaged in by the members of Local 35 was that of the basic strike of the Pressmen, *i.e.*, the Pressmen's contract, and since the Pressmen's contract was by no means cognizable under the terms of Local 35's contract, the dispute which gave rise to Local 35's strike was not a grievable dispute, and the strike did not therefore fall within the no-strike ban of Section 13.

Nonetheless, the ALJ concluded that the twelve employees had breached the no-strike clause of § 13. The ALJ found in effect that § 12, coupled with collateral evidence of contractual intent with respect thereto,[3] revealed an intent on the part of the parties to encompass within § 12 a prohibition from honoring any picket line except that of a subordinate union of the ITU. The ALJ recognized that no language in the bargaining agreement expressly waived the right to defer to another union's picket line, but he implied such a waiver from the language of § 12 and extrinsic evidence. See note 3, *supra*. Accordingly, he concluded that the employees had lost the protection of the Act and recommended that the complaint be dismissed.

A majority of the Board agreed with the ALJ's conclusion that the strike by Local 35 members did not fall within the ban of § 13. Similarly, the majority found that § 12 did not expressly waive the right to honor another union's picket line. The majority rejected the ALJ's finding that the language of § 12, buttressed by collateral evidence, gave rise to an inference that employees could be required to cross picket lines of other unions. It found that there had been no implied waiver of the statutory right of Local 35 members to respect the Pressmen's picket line. On the basis of its analysis of the contractual language, the actions of the parties, and its unwillingness to find an unequivocal waiver expressed in "clear and unmistakable" language, the majority found that the Company had engaged in unfair labor practices in violation of Sections 8(a)(1) and (3) of the Act.

The dissenting member of the Board found it unnecessary to consider, as had the ALJ and the majority, the applicability of § 13 of the contract to the strike. His conclusion that the recommended order of dismissal should be adopted was grounded upon his view that the refusal of Local 35 members to cross the Pressmen's picket line was a breach of § 12 of the labor agreement. He distinguished *Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284 (7th Cir.1975), *cert denied,* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252, the factual details of which he viewed as representing the converse of the instant case, and opined that the language of § 12 inescapably implied that the Local 35 members were prohibited from honoring any other picket line. The dissenting member reviewed the collateral evidence and concluded that Local 35 members had shown that they "understood that Section 12 meant that the Union's members were prohibited from refusing to cross the picket line of a union which was not a

---

**3.** The Administrative Law Judge concluded that the parties understood that the contractual language of Section 12 meant that Local 35 members were prohibited from honoring the particular picket line; that they understood the president of the Local to mean that they should go to work across the picket line; and that the Union's attempt in its last previous contract negotiation to broaden its long-standing picket-line clause to all picket lines at the plant revealed its belief that the contract as it existed would not protect such sympathy picketing.

subordinate union of the ITU."[4] He thought it clear that under that section of the contract, Local 35 had waived the employees' statutory right to lend support to the striking Pressmen by refusing to work.

The Board's order whose enforcement is here sought directed the Company to cease and desist from the unfair labor practices, and to make whole the twelve employees for any loss of wages suffered by them.

## I. General Background: Decisional Conflict

In our opinion, the key element in this case is the interrelationship of Sections 12 and 13 of the bargaining agreement. We regard the decisive question to be whether Local 35 had a duty to arbitrate its dispute over the application and construction of the picket-line clause before honoring the Pressmen's picket line by engaging in a work stoppage. This question cannot be resolved in a vacuum. The reported cases demonstrate that considerable difference of opinion developed in the years following the decision of *Boys Market, Inc. v. Retail Clerk's Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The divergent lines of authority concerned the power of a federal district court to grant injunctive relief where a union has entered into a collective-bargaining agreement establishing a mandatory arbitration procedure and a no-strike clause but subsequently strikes solely out of deference to another union's lawful picket line at a place of employment common to the two unions.

It is unnecessary at this point to probe the underlying rationale supporting the divergent holdings in cases where employers have sought to invoke the *Boys Market* exception to the anti-injunction provision of the Norris-LaGuardia Act, 29 U.S.C. § 104. The recent decision of *Buffalo Forge Co. v. United Steelworkers of America*, AFL–CIO, —— U.S. ——, 96 S.Ct. 3141, 48 L.Ed.2d ——, 44 U.S.L.W. 5346 (1976), has settled the conflict among the circuits by holding that a federal court may not enjoin a work stoppage found to be a sympathy strike in support of sister unions negotiating with the employer even though the issue whether the sympathy strike violated the Union's no-strike undertaking is concededly arbitrable.

Long before the *Buffalo Forge* decision, this court had been sensitive to the competing interests at stake in cases involving picket-line questions. Our opinion in *Hyster Co. v. Employees Assn. of Kewanee*, 519 F.2d 89 (7th Cir.1975), *cert. denied*, —— U.S. ——, 96 S.Ct. 3220, 48 L.Ed.2d ——, 44 U.S.L.W. 3762 (1976), was circulated among all judges of this court in regular active service in view of the possible inconsistency between its holding and those of certain other circuits. 519 F.2d at 92n.3. Examination of our decisions discloses that this court has at times found persuasive the reasoning of cases on both sides of the question. We read the recent *Buffalo Forge* opinion as implicitly recognizing this court's careful approach to sympathy strike cases. After observing that the decision of the Second Circuit was in accord with those of the Fifth and Sixth Circuits but at odds with decisions of the Third, Fourth, and Eighth Circuits, the Supreme Court noted that the Seventh Circuit "has adopted an intermediate position." At ——, 96 S.Ct. at 3146, 44 U.S.L.W. at 5348 n. 9, citing *Hyster* and *Gary Hobart, supra*. In the same note, however, the Court did suggest that our earlier decision in *Inland Steel Co. v. Local Union No. 1545, United Mine Workers*, 505 F.2d 293 (7th Cir.1974), might represent a somewhat different position.[5]

In light of the necessary balancing of policy demands in situations where unions have resorted to economic force, it is not surprising that judicial opinions have been so nuanced as to suggest possible inconsist-

**4.** Local 35 is affiliated with the International Typographical Union. The Pressmen's union was not a subordinate union of the ITU.

**5.** Later in the Court's opinion, it was noted that to the extent courts of appeals, including this

court in *Inland Steel*, "have assumed that a mandatory arbitration clause implies a commitment not to engage in sympathy strikes, they are wrong." At ——, 96 S.Ct. at 3147, 44 U.S.L.W. at 5350 n.10.

ency. Questions involving the relation between arbitration and strikes involve important policy interests. Notwithstanding recurring opportunities for the adoption of divergent approaches, we have not located any direct inconsistency within the decisions of this court. *Compare Western Pub. Co., Inc. v. Local 254, Graphic Arts I.U.,* 522 F.2d 530 (7th Cir.1975), *cert denied,* 423 U.S. 1088, 96 S.Ct. 880, 47 L.Ed.2d 98, 44 U.S.L.W. 3428 (1976), *with Gary Hobart* and *Hyster, supra.* Our continued adherence to an intermediate position which bridged the developing conflict among the other circuits has rested on a case-by-case analysis of the language of the bargaining agreements in issue and on their operation within the factual circumstances of the labor controversy at hand.

The *Buffalo Forge* decision does inject a new factor into this court's approach to sympathy strike cases. In *Hyster, supra,* this court expressed the view that, whether the arbitrability issue arises in the context of an unfair labor practice proceeding or in the context of injunctive orders granted by district courts under *Boys Market,* it must be determined by the language of the bargaining agreement. The virtual assimilation of *Boys Market* cases with Board proceedings stemmed from the fact that in *Gary Hobart, supra,* this court treated its *Inland Steel* decision as being applicable albeit distinguishable, precedent.

■ As we read *Buffalo Forge,* this blending of enforcement cases with injunction decisions is no longer viable. The Supreme Court has ruled that because of the Norris-LaGuardia Act no injunction can issue, but it has recognized that

> [w]hether the sympathy strike the Union called violated the no-strike clause, and the appropriate remedies if it did, are subject to the agreed-upon dispute-settlement procedures of the contract and are ultimately issues for the arbitrator. The employer thus was entitled to invoke the arbitral process to determine the legality of the sympathy strike and to obtain a court order requiring the Union to arbitrate if the Union refused to do so. Fur-

thermore, were the issue arbitrated and the strike found illegal, the relevant federal statutes as construed in our cases would permit an injunction to enforce the arbitral decision. [Citations omitted.]

At ——, 96 S.Ct. at 3146, 44 U.S.L.W. at 5349. Accordingly, it is altogether possible that a strike may violate a contract or be illegal even though the employer cannot secure injunctive relief against the strike under *Buffalo Forge.* Whether disciplinary suspensions based upon the strike constitute an unfair labor practice presents a different question.

Our *Gary Hobart* and *Hyster* opinions state that "[t]he refusal to dishonor another local union's picket line or engaging in a sympathy strike in connection with another local's strike are not disputes or controversies arising under or in connection with the first local union's agreement and are therefore neither arbitrable nor subject to the no-strike provision[s] [of the bargaining agreements]." 511 F.2d at 288; 519 F.2d at 91. This statement that a refusal to dishonor a stranger union's picket line is not arbitrable must, however, be read in the light of this court's adherence to the procedure of examination of the particular language of the bargaining agreement and the fact that the decisional language was used in analyzing controversies where the agreements lacked a picket-line clause. The present case involves a situation where there is not only such a clause but also a broad no-strike and arbitration clause. As in *Buffalo Forge,* the contract at issue in this proceeding may have an arbitration clause "broad enough to reach not only disputes between the Union and the employer about other provisions in the contract but also as to the meaning and application of the no-strike clause itself." At ——, 96 S.Ct. at 3146, 44 U.S.L.W. at 5349. Whether or not this is the case is one of the questions upon which the Board and the Company entertain widely disparate views.

## II. *Contentions of the Parties*

Before this court, the parties adopt variant formulations of the positions staked out

by the ALJ, the Board majority, and the dissenting Board member. The Board contends that because the employees' sympathetic conduct in observing the Pressmen's picket line presented no arbitrable dispute, it was reasonable to conclude that the conduct of Local 35 members did not fall within the no-strike ban of Section 13 of the bargaining agreement. The Board's counsel candidly admits that this is a close case and that the Company's contrary argument is not unreasonable. The Board vigorously presses its view that sympathetic activity, while occasioned by some other group's dispute with an employer, itself involves no issues which can be resolved alternatively by self-help or by resort to the grievance procedure. Accordingly, the right to engage in sympathetic activity must be presumptively excluded from the prohibitory scope of a general no-strike clause. The Board concludes that, unless such sympathetic rights have been specifically waived in the collective-bargaining agreement, the union as well as the individual employees may exercise them under the protection of the Act.

More directly, the Board argues that Section 12 does not waive the employees' right to engage in sympathetic activity. It cites authority for the proposition that clauses which confer contractual protection on some portion of employees' statutory rights should not be interpreted as waiving related rights as to which the agreement is silent. The Board asserts that this court's *Hyster* and *Gary Hobart* decisions preclude any argument that a dispute over the meaning and applications of the picket-line clause is arbitrable.

The response of the Company and of the Graphic Arts Union Employers of America, as amicus curiae, reproduces the analysis of the ALJ and adds some refinements thereto. As to the Section 13 argument, the Company urges that *Hyster* and *Gary Hobart* are distinguishable. It crystallizes its basic Section 13 argument by succinctly

stating that "[s]uch a dispute over the meaning of the no-strike clause and the limited picket line clause certainly was within the scope of an arbitrable grievance."

■ The Company also argues forcefully that the only logical and reasonable construction of the parties' mutual intent is that by stating what picket lines may be honored, Section 12 says that all other picket lines must be crossed. The amicus similarly points out that Section 12 would appear to be a clear demonstration of the principle of *expressio unius est exclusio alterius*, not a new maxim of legal construction. There is persuasiveness in this argument particularly when the Section 12 language is considered in conjunction with the collateral evidence of contractual intent. Notwithstanding the persuasiveness of this argument, we deem it preferable to reach disposition of this case on a broader viewpoint basis which will necessitate turning to prior authority. Also we are not unmindful that the ordinary rules of contractual construction are not, because of policy and other factors, necessarily or automatically always applied in determining the meaning of provisions in collective-bargaining agreements.

### III. Applicability of Section 13

■ The policy of the law favors arbitration and the peaceful resolution of labor disputes. *Western Publishing, supra* at 532. The *Steelworkers* trilogy[6] has instructed the lower courts to resolve all doubts about the arbitrability of disputes in favor of arbitration, and the well-known presumption of arbitrability has been reaffirmed in *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). That presumption disappears if it "may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 377–78, 94 S.Ct. at 637.

**6.** *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrier & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

Section 13 of the collective bargaining agreement, set out in note 2 *supra*, makes the Joint Standing Committee the sole forum for the resolution of "all disputes which may arise as to the application of and construction to be placed upon any provision of this agreement, or alleged violation thereof." Clearly, the limited picket-line clause embodied in Section 12 was a provision of the contract. Equally as clear is the undisputed fact that the Company "alleged a violation thereof" when it insisted that Local 35 members would be breaching their labor contract if they determined to honor the Pressmen's picket line. The Company informed a union agent of its position concerning the contractual responsibility of Local 35 members even before the Pressmen's strike commenced.

In the light of *Gateway*, the Board's conclusion that the conduct of Local 35 members did not fall within the no-strike ban of Section 13 implies that the Board can state with positive assurance that Section 13 was not susceptible of an interpretation covering the asserted dispute over the application of and construction to be placed upon Section 12. We do not think that the policy of the labor statutes to implement private resolution of disputes in the manner agreed upon, see *Buffalo Forge, supra* at ——, 96 S.Ct. at 3147, 44 U.S.L.W. at 5349, allows this court to reach so easily a conclusion that the dispute over the meaning of Section 12 was not an arbitrable issue.

The language of the agreement authorizes the Joint Standing Committee to resolve disputes involving alleged violations of any provision of the agreement. Note 2, *supra*. We would be constrained to hold that the Board's finding and conclusion that Section 13 was inapplicable to the present case was devoid of evidentiary support in the record were it not for the suggested possibility that *Gary Hobart* and *Hyster* preclude any such holding. Our analysis of the teaching of those opinions must, of course, proceed in the light of the subsequent Supreme Court analysis in *Buffalo Forge*. At least one paragraph in the majority opinion in that case suggests that the dispute between Local 35 and the Company over the meaning of the no-strike clause of Section 13 was likewise a matter for the arbitral panel.[7]

We turn now to the *Gary Hobart* and *Hyster* precedents. The opinions in those decisions stated that the refusal of union members to dishonor the picket line of another local union was neither arbitrable nor subject to the no-strike provisions of the respective bargaining agreements. Moreover, the language of the *Hyster* opinion suggests that this court can find the dispute over the meaning of Section 12 to be an arbitrable issue only if it first finds clear and unmistakable language waiving the statutory rights of Local 35 members to engage in a sympathy strike. On this record such a finding has its difficulties, because the picket-line clause permits Local 35 members to honor authorized picket lines of any other subordinate ITU union but does not explicitly *prohibit* employees from honoring the picket lines of non-ITU unions. The finding of the Board that there was no express waiver is supported by substantial evidence and would not therefore be considered erroneous by this court.

In our view, however, there are persuasive reasons why the language of the *Hyster* opinion cannot be read as controlling the present case. Before explicating these reasons, it is necessary to set forth and interpret the salient portion of that

---

7. Having earlier noted the exact language of the no-strike clause involved in the controversy between the Buffalo Forge Company and the United Steelworkers, the Court observed:

> The contract here at issue, however, also contained grievance and arbitration provisions for settling disputes over the interpretation and application of the provisions of the contract, *including the no-strike clause.*

That clause, like others, was subject to enforcement in accordance with the procedures set out in the contract. Here the Union .struck, and the parties were in dispute whether the sympathy strike violated the Union's no-strike undertaking. Concededly, that issue was arbitrable. [Emphasis supplied.]

At ——, 96 S.Ct. at 3148, 44 U.S.L.W. at 5350.

opinion. Although we think that *Buffalo Forge* allows us to use as a possibly distinguishing factor the fact that the case involved the grant or denial of a *Boys Market* injunction rather than unfair labor practice charges, we need not attach controlling significance to that possibility.

In *Hyster*, the court noted:

[T]he fact that the work stoppage "was not 'over a grievance' which the parties were contractually bound to arbitrate" but rather "itself precipitated the dispute." *Cf. Amstar Corp. v. Amalgamated Meat & B. Workmen*, 468 F.2d 1372, 1373 (5th Cir. 1972), and Judge Fairchild's dissent in *Inland Steel*, with which compare the majority's reference to *Amstar* in *Inland Steel*, 505 F.2d at 299. Moreover, the waiver of a collective bargaining right must be in "clear and unmistakable language." *Gary Hobart Water Corp. v. N.L.R.B., supra*, 511 F.2d at 287, quoting from *N.L.R.B. v. Wisconsin Aluminum Foundry Co.*, 440 F.2d 393, 399 (7th Cir. 1971) (which in turn takes the phrase from a line of Sixth Circuit cases, including *Beacon Journal Publishing Co. v. N.L.R.B.*, 401 F.2d 366, 367 (6th Cir. 1968)). We are unable to find in the agreements before us that which *Gary Hobart* holds is essential if a union and its members are to be denied the right to honor a stranger union's picket lines and thereby engage in a sympathy strike, *viz.*, "clear and unmistakable language waiving [the] right to engage in such a strike." (511 F.2d at 287, 288.) *Since there was no waiver and the dispute was not arbitrable, a Boys Market injunction could not properly be issued.* [Emphasis supplied.]

*Id.* at 92.

We should not, however, read the language of judicial opinions without regard to the factual circumstances of the litigation in which it appears or to the analytic framework in which the language is used. A closer examination of the quoted excerpt reveals, for instance, that the opinion focuses on several distinct factors.

Thus, the *Hyster* court accepted as an established fact that the parties were not contractually bound to arbitrate. And it is clear on the facts of *Hyster* that no clause of the contract covered the specific question of picket lines. Here, by way of contrast, the parties have incorporated language, albeit permissive, which embodies at least some understanding regarding the rights of employees to honor non-ITU picket lines.

Further, the *Hyster* opinion focused on the lack of a clear and unmistakable waiver, summarizing the holding of *Gary Hobart* as establishing such a waiver as an essential prerequisite to the denial of employees' right to honor a stranger union's picket line. Yet the *Gary Hobart* holding depends in turn upon the factual circumstances of that controversy, which involved a situation where "no specific language dealing with sympathy strikes was included in the women's unit agreement." 511 F.2d at 288. The *Gary Hobart* court was willing to assume that the no-strike-arbitration clause was broad enough to make sympathy strikes and the honoring of a stranger union's picket lines arbitrable, *id.* at 289, and it focused some attention upon the fact that the Board had retained jurisdiction and proceeded to determine the case on the merits after the Company had refused to resolve the issues in dispute by settlement under the grievance procedure or by submission to arbitration. *Id.*

In this case, there is no refusal by the Company to submit the dispute over the meaning of Section 12 to the Joint Standing Committee. Instead, there is the concerted action of a work stoppage. Although Local 35's President Donald Clark at one point indicated that the union was willing to meet with the Company to discuss the latter's allegations of violations of the collective bargaining agreement, the record indicates that no such efforts to resolve the dispute were pursued.

In our opinion *Gary Hobart* and *Hyster* are distinguishable. In the present case, there is the important fact that the parties have agreed to resolve *all disputes* regard-

ing the provisions of the contract through an arbitration procedure. In our opinion, the picket-line clause, absent in the aforementioned cases, was clearly a matter which the arbitral panel was authorized to interpret and to apply.

On this record, it makes no sense to conclude that the court can find that a dispute is arbitrable only after finding in the present agreement an unmistakable waiver of the union's sympathy strike rights. In the light of the federal policy favoring arbitration, such a conclusion would pre-empt the role of the arbitral panel. A judicial determination that Section 12 embodies an implied waiver of the employees' statutory right to honor the picket lines of unions other than subordinate locals of the ITU would resolve the very dispute the Joint Standing Committee would be called upon to consider.

In our opinion *Buffalo Forge* strengthens the proposition that the courts should refrain from becoming participants in arbitrable disputes under bargaining agreements by preliminarily dealing with the merits of the factual and legal issues that are properly subjects for the arbitrator. See at ——, 96 S.Ct. at 3148, 44 U.S.L.W. at 5350. The different readings of the scope of Section 12 which have emerged in this case demonstrate that there is some difficulty in uncovering its meaning and effect. The unmistakable policy of Congress has been that final adjustment by a method agreed upon by the parties is the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. *Gateway, supra,* 414 U.S. at 377, 94 S.Ct. 629; *Accord, Buffalo Forge, supra* at ——, 96 S.Ct. at 3148, 44 U.S.L.W. at 5351.

The Court stated in *Buffalo Forge* that "[i]t is incredible to believe that the courts would always view the facts and the contract as the arbitrator would . . . . and difficult to believe that the arbitrator would not be heavily influenced or wholly pre-empted by judicial views of the facts and the meaning of contracts if this proce-

dure is to be permitted." *Id.* at ——, 96 S.Ct. at 3149, 44 U.S.L.W. at 5351. Our recognition of this possibility points the way for the proper treatment of cases wherein the asserted dispute focuses upon the interpretation and application of a permissive picket-line clause. We conclude that any requirement that the court first determine that the union has unmistakably waived its sympathy strike rights before ascertaining the scope of a no-strike-arbitration clause in an unfair labor practices context would undercut the presumption in favor of arbitrability established in the *Steelworkers* trilogy, confirmed in *Gateway,* and favored in *Buffalo Forge.* If this court were now to accept the Board's argument that the language of *Gary Hobart* or *Hyster* is controlling in this case, it would be encouraging employees unsure about the reach of permissive picket-line clauses to resort to work stoppages rather than arbitral processes as a means of testing the interpretation of collective bargaining agreements.

We do not entertain the opinion that *Gary Hobart* and *Hyster* were incorrectly decided; it is just quite simply that the present case is an entirely different one. We conclude that the dispute over the interpretation of Section 12 was an arbitrable issue. Especially in view of the Company's pre-strike communications seeking the cooperation of Local 35 in requiring the employees to fulfill their contractual responsibilities, its members had no right to resort to economic force or to honor the Pressmen's picket line prior to invocation of the arbitral procedure. The finding or conclusion of the Board that Section 13 was inapplicable is unsupportable.

### IV. The Section 12 Waiver of Sympathetic Strike Rights.

Our conclusion that Local 35 members were contractually bound to arbitrate the dispute over the construction of Section 12 once disagreement over its effect emerged makes it unnecessary for this court to examine the disparate readings of Section 12

adopted by the Board majority, and dissenting member, and the ALJ. Their opinions regarding an implied waiver of sympathetic strike rights by Local 35 apparently stem from the fact that there had not been a strike at Keller-Crescent for approximately twenty-five years. This record of labor peace presented few opportunities for the parties to dispel any ambiguity which the permissive language of Section 12 engendered. That language was originally inserted into the form contract almost thirty years earlier, see *American Newspaper Pub. Ass'n v. NLRB*, 193 F.2d 782 (7th Cir. 1951), *aff'd*, 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852 (1953). A Joint Standing Committee apparently has never had the opportunity to fulfill its initial responsibility of resolving disputes as to its construction and application.

In *International Union of Operating Engineers, Local No. 139 v. Carl A. Morse*, 529 F.2d 574, 580–81 (7th Cir. 1976), this court briefly related some of the basic reasons why disputes involving form contracts of general applicability are wisely committed to arbitral resolution. It is unnecessary at this point to elaborate upon those reasons.

Because we conclude that Local 35 members breached the labor contract by stopping work rather than taking their dispute to the Joint Standing Committee, it necessarily follows that Keller-Crescent committed no unfair labor practice when it suspended the twelve employees for their conduct. Accordingly, the application for enforcement of the Board order is denied.

ENFORCEMENT DENIED.