## LOCAL 738 I.B. OF T. FOOD AND ALLIED EMPLOYERS' HEALTH AND WELFARE FUND, Plaintiff,

v.

## RANDOLPH PICKLE COMPANY, Defendant.

No. 88 C 8209.

United States District Court, N.D. Illinois, E.D.

March 16, 1989.

Joseph T. Moriarty, Erbacci, Syracuse & Cerone, Ltd., Chicago, Ill., for plaintiff.

Steven R. Peltin, Altheimer & Gray, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Local 738 I.B. of T. Food and Allied Employers' Health and Welfare Fund

("Fund") has sued Randolph Pickle Company ("Randolph") under the civil enforcement provision of ERISA, 29 U.S.C. § 1132, asserting Randolph underpaid its 1984 contributions to Fund by $9,464.20. Both parties now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, both motions are denied.

*Facts* [1]

Randolph and Teamsters Local Union No. 738 ("Union") were parties to a collective bargaining agreement ("CBA") for a three-year term from August 1, 1983 to July 31, 1986. CBA Article 33(B) imposed this obligation on Randolph:

> The Employer agrees to make contribution to the Welfare Fund as follows:
>
> Effective: July 1, 1983, eighty cents ($.80) per hour, not to exceed forty (40) hours per week.

During 1984 Randolph did make contributions pursuant to Article 33(B), but only for hours actually worked by collective bargaining unit members at the straight time hourly rate. It made no contributions for vacation, holiday or overtime hours. In September 1986 Fund's trustees ordered an audit that revealed the absence of such contributions. On January 7, 1987 Fund advised Randolph it owed $9,464.20 and demanded payment.

So much for the facts not in dispute. What is at issue is how the parties got into that position. That calls for a return to 1972 and two very different versions of the facts.

At that early date the CBA between Randolph and Union had no provision for Fund contributions. According to Union Vice-President Herron Roberson ("Roberson"), who negotiated the 1972 CBA,[2] Randolph agreed to reopen the CBA on August 1, 1972 to add a provision requiring such contributions (Roberson Aff. ¶ 3). On September 28, 1982 Randolph Assistant Secretary Barry Nekritz ("Nekritz")[3] sent a letter to Roberson establishing the first contributions to Fund (*id.* Ex. B):

> (2) Article XIV(d) is hereby deleted and the following paragraph will be inserted in its place:
>
> (d) WELFARE PROGRAM
>
> (1) It is agreed that the jointly administered Welfare Fund established November 1, 1946, shall be in full force for all regular employees covered by this Agreement and all powers and authority of the Welfare Fund Trustees originally granted are hereby re-affirmed and all acts done pursuant to the Trust Agreement of said Fund are hereby ratified.
>
> \*    \*    \*    \*    \*    \*
>
> (2) The Employer agrees to make contribution to the Welfare Fund as follows:
>
> Effective September 1, 1972
>
> \*    \*    \*    \*    \*    \*
>
> (4) The welfare program provided hereunder will at no time cost employer in excess of 19 cents ($.19) per hour to the end of the term hereof and will be payable for a maxiumu [sic] of 40 hours per week per employee.

Roberson signed that letter agreement on Union's behalf.

Roberson also later negotiated the 1974 CBA. Its relevant provision read this way (Roberson Aff.Ex. C):

> The employer agrees to make contribution to the Welfare Fund as follows:

---

**1.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—(*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual perspective that sometimes causes the denial of both motions. Unfortunately that is exactly what has occurred here.

**2.** At that time Roberson was Union's business agent (Roberson Aff. ¶ 2).

**3.** Apart from Nekritz' nominal corporate officership, he was a partner in the law firm representing Randolph—the letter next referred to in the text was written on the law firm's letterhead.

Effective: August 1, 1974, Twenty–four cents ($.24) per hour not to exceed forty (40) hours per week.

Except for changes in the per-hour payment amounts, that language was carried over verbatim into later CBAs—in 1977, 1980 and 1983. Roberson *id.* ¶¶ 6–7 says that at no time during the negotiation of the 1972 letter agreement or the 1974 CBA (1) did Randolph ever assert contributions to Fund would exclude holiday and vacation hours or (2) did Roberson agree to any such exclusions.

Randolph President Garry Newman ("Newman") tells a very different story. Newman says Randolph was not obligated to make Fund contributions before 1974.[4] Then in June or July 1974 Newman met with Roberson to negotiate a new CBA (Newman Aff. ¶ 3; Newman Supp.Aff. ¶ 2). During those negotiations Newman agreed to contribute to the Fund "at the rate of 24 cents for each hour actually worked at straight time, up to a maximum of forty each week" (Newman Aff. ¶ 3). But according to Newman (*id.*):

> I specifically stated during negotiations that Randolph would not make contributions for vacation hours, holiday hours or hours worked in excess of forty in a week. The Union negotiators agreed to these conditions.

Newman also says there was no discussion of either the language or the meaning of 1983 CBA Article 33(B) (*id.* ¶ 6).[5]

Randolph's Fund contributions since 1974 have always excluded payments for vacation, holiday and overtime hours. Until January 7, 1987 neither Union nor Fund's trustees has or have ever objected to Randolph's interpretation.

### Positions of the Parties

Randolph contends:

1. Article 33(B) unambiguously excludes overtime hours.

2. Though the CBA language is silent as to vacation and holidays, extrinsic evidence clearly shows Randolph need not contribute for such hours.

3. Alternatively, even if the contract language were viewed as requiring such payment, equitable principles of waiver, laches and estoppel bar any recovery by Fund.

Fund responds:

1. No extrinsic evidence is necessary because Article 33(B) clearly and unambiguously includes holiday, vacation and some overtime hours.

2. Alternatively, if extrinsic evidence is found necessary, Newman's affidavit cannot suffice because it fails to satisfy the Rule 56(e) requirement of admissible evidence.

3. Equity does not bar Fund's claims because Randolph cannot show detrimental reliance.

One component of overtime hours is not at issue here. CBA Article 12(1) defines overtime as:

> All work performed in excess of eight (8) hours per day of [sic] forty (40) hours per week.

Because Article 33(B) clearly excludes time in excess of forty hours per week, Fund does not of course seek payment for such hours (Fund Mem. 7).

### Language of the CBA

Conventional wisdom distinguishes somewhat between collective bargaining agreements and commercial contracts. *Transportation–Communication Employees Union v. Union Pacific Railroad Co.*, 385 U.S. 157, 160–61, 87 S.Ct. 369, 371–72, 17 L.Ed.2d 264 (1966) (citations omitted) puts it this way:

---

**4.** Newman Aff.Ex. 1 is a copy of the 1972 CBA—but it lacks the language of the later-dated letter agreement signed by Roberson and Nekritz, nor does the body of Newman's affidavit even mention that document. That omission certainly gives the lie to Newman's statement that no contributions were required before 1974, and a trier of fact could well find Newman's overall credibility mortally wounded. But the Rule 56 principles set out in n. 1 spare Randolph that fate.

**5.** It will be recalled that language (like that in the 1977 and 1980 CBAs) mirrored the corresponding provision in the 1974 CBA, except for the differences in the per-hour contribution.

A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts.... "... [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." ... In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.[6]

Of course, Fund R.Mem. 6 is quite right that courts should not look outside the contract if it is clear and unambiguous. But Article 33(B) does not unambiguously address this dispute. Rather, the CBA lacks any express provision either including or excluding vacation, holiday and overtime hours.[7]

Fund Mem. 6 (emphasis in original) attempts to use that silence to its advantage:

There is no limitation on the kind of hour for which Randolph must contribute and there are no exclusions of certain types of hours in the language. The language can only be read to include *all* hours up to a maximum of 40 hours per week.

To that end Fund goes on to emphasize that where the parties intended to limit the term "hour" they specifically modified it. For example, CBA Article 31 provides for payment to the Medical Fund:

[T]he Company shall pay two cents ($.02) per hour, for each employee covered by this Agreement (maximum eighty cents ($.80) weekly) for hours worked based on straight time....

Likewise, CBA Article 29(2) obligates Randolph to pay for an employee's jury service "at the employee's straight time hourly rate." Article 29(4) then expressly excludes holidays and vacations from that provision.

Those provisions and the inferences drawn from them might well carry the day in the context of an ultimate trial, when the litigants' conflicting submissions must be resolved. But today's posture is one that precludes such factual resolution in the face of potentially competing inferences (see n. 1), so the question is whether the CBA provisions adduced by Fund render Article 33(B) so unambiguous as to foreclose reference to extra-contractual evidence.

On that score it cannot be said those other provisions convert Article 33(B) into an unambiguous all-inclusive catch-all. If that were so Randolph would also have to contribute for hours spent on such matters as jury duty, bereavement leave and medical leave. But Fund makes no such sweeping claim, nor is there any evidence to support such a sweeping interpretation.

Because it cannot fairly be said that Article 33(B) is wholly unambiguous, *Union Pacific* counsels this Court to look outside the four corners of the agreement to glean the parties' intention.. This opinion therefore turns first to their negotiating history, then to their past practice.

### 1. *History of Negotiations*

Newman says that in negotiating the linear predecessor of Article 33(B)—the one he dates back to 1974—he specifically excluded vacation, holiday and overtime hours.[8] "Not so," says Roberson: His Aff.

6. [Footnote by this Court] See also such cases as *NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 829–30 (7th Cir.1988); *Randall v. Lodge No. 1076, International Ass'n of Machinists and Aerospace Workers, AFL–CIO*, 648 F.2d 462, 466 (7th Cir.1981), quoting *F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union*, 629 F.2d 1204, 1215 (7th Cir.1980); *NLRB v. Keller–Crescent Co.*, 538 F.2d 1291, 1297 (7th Cir.1976).

7. This is not to say the CBA lacks some potential inference-creating (as contrasted with express) language. Those provisions are dealt with in the next paragraph of the text.

8. Fund Mem. 6 challenged Newman's affidavit as lacking in foundation and hence inadmissible. Randolph then filed a supplemental affidavit curing Fund's two objections: Newman identified Roberson as the union negotiator and

¶¶ 6–7 say that Newman never limited the agreement in such a manner and Roberson never agreed to such a limitation.

That square conflict forecloses any Rule 56 decision. On Randolph's motion this Court must credit Roberson's account and discredit Newman's, while on Fund's motion the situation is reversed. No better example of a material factual dispute that compels the defeat of both summary judgment motions could be imagined.

### 2. *Past Practice*

Randolph Mem. 5–6 says past practice between the parties presumptively establishes the proper interpretation of Article 33(B). Randolph has excluded vacation, holiday and overtime hours for ten years. It argues Fund's failure to object to that exclusion manifests an acceptance of Randolph's interpretation.[9]

Fund Mem. 11 retorts that evidence of past practice is irrelevant because "there is no evidence that the Welfare Fund knew of Randolph's practice." According to Fund (*id.*):

> [E]vidence of past practice is relevant to interpret ambiguous language only if both parties to the contract know about the practice and have by their conduct established the practice as the proper was [sic] of operating.

Fund is quite right. *Uncommunicated* unilateral interpretations cannot establish a past practice or custom. That critical factor of a lack of communication is what negates the possibility described in Elkouri and Elkouri, *How Arbitration Works* 452 (4th ed. 1985) (footnotes omitted):

> The weight to be accorded past practice as an interpretation guide may vary

greatly from case to case. In this regard, the degree of mutuality is an important factor. Unilateral interpretations might not bind the other party. However, continued failure of one party to object to the other party's interpretation is sometimes held to constitute acceptance of such interpretation so as, in effect, to make it mutual.

It is appropriate to use past practice only if Fund "knew or should have reasonably known" of that practice (*id.* at 453, footnote omitted). After all, Randolph's interpretation cannot be labeled a "past practice" in a contractual sense if Randolph was the only party aware of how it was construing the CBA.

Only a moment's reflection is needed to demonstrate why that is so. Conduct ("past practice") becomes a building block in contractual relationships on the sensible premise that any contracting party has an incentive to object to any action that diminishes or encumbers its contractual rights. If Fund (or Union, for that matter) knew that Randolph was excluding vacation, holiday and overtime hours from its payments in contravention of Fund's (or Union's) understanding of Randolph's obligations, a swift objection should have been forthcoming. And a failure to object could properly be read as an acquiescence in Randolph's interpretation—as an admission that Article 33(B) really does exclude the disputed hours.

But Randolph presents no shred of evidence that Fund knew about Randolph's exclusion of vacation, holiday and overtime hours from its payments. Nor is there any evidence even suggesting Fund should have known about Randolph's interpretation. On the contrary, Fund administrator

---

identified the date of discussion as June or July 1974.

**9.** Randolph seeks to draw support from the opinion of this Court's colleague, Honorable William Hart, in *Local 738 I.B. of T. Food and Allied Employer's Health and Welfare Fund, and Local 738 I.B. of T. Deferred Compensation and Pension Fund v. Dearborn Wholesale Grocers, Inc.,* 1988 U.S.Dist. LEXIS 5725, at 10–11, —— F.Supp. ——, ——–—— (N.D.Ill.). But although *Dearborn Grocers* involved an identical claim by the same Fund that sues here, the

contract language was strikingly different. Even though Judge Hart did rely on the past practice between the parties (and on Fund's silence over the long period of their relationship) in holding vacation and holiday hours excluded, the critically different factual matrices between the two cases render *Dearborn Grocers* noncontrolling here. If any degree of tension is perceived to exist between the analyses there and here, it stems from the considerations discussed in the text that follows.

Elizabeth Horvath ("Horvath") says (Horvath Aff. ¶ 4):

> 4. Employers who contribute to the Welfare Fund submit contribution reports which state the number of units per employee for which the employer is contributing and the total amount it is contributing per employee. It is impossible to discern from these reports whether an employer is contributing in the manner required by a collective bargaining agreement. Specifically, the contribution reports do not reveal if an employer is excluding certain types of units such as holiday and vacation hours. Only a payroll audit can reveal if an employer is making proper contributions.

In the total absence of any evidence that Fund knew or should have known about Randolph's interpretation, Fund cannot be bound to Randolph's unilateral reading. No past practice has been established to provide grist for the mill of contractual interpretation of Article 33(B).[10]

### Equitable Defenses

Randolph Mem. 7–8 says Fund's claim is barred by the principles of waiver, laches and estoppel. Again only a brief discussion is necessary to reject Randolph's flawed argument.

"Waiver is a contractual defense" (*LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 933 (7th Cir.1988)). *Havoco of America, Inc. v. Hilco, Inc.*, 799 F.2d 349, 354 (7th Cir.1986) (citations omitted) confirms the need for intent—and hence knowledge —to establish that defense:

> It is also clear that an essential element of waiver is that the injured party intended to affirm the contract and intended to abandon his right to recover damages...." If the intention to waive is implied from conduct, the conduct should speak the intention clearly." ... Intent is a question of fact.

What has just been said as to the past-practice issue defeats any potential for a finding of waiver as well. Randolph has offered no factual predicate to support such a ruling.

Nor does Randolph fare any better with its claims of laches and estoppel. Because "laches is akin to an estoppel" (*Bennett v. Tucker*, 827 F.2d 63, 69 (7th Cir.1987)), comparable analysis applies to both defenses (see, e.g., *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 674 (7th Cir. 1982)). In general they have two elements (*Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir.1988) (citation omitted), speaking of laches):

> (1) a lack of diligence by the plaintiff, and (2) prejudice resulting from the delay. Under this two-prong approach, the plaintiff bears the burden of explaining his delay in bringing suit. "If the delay is inexcusable, then the defendant must show prejudice."

Even were this Court to give Randolph the benefit of the doubt on the first of those factors,[11] Randolph still fails on the second. After all, if it must belatedly pay an amount it was obligated to pay all along, it can scarcely complain about that.[12]

Randolph does contend that had it known about Fund's current interpretation of Article 33(B), it could have clarified the provision during negotiations. But that is speculative at best. It requires dual assump-

---

10. For its part, Fund R.Mem. 10–11 also urges that Horvath's affidavit demonstrates an industry practice of *including* holiday and vacation hours in the contributions. Industry practice would no doubt be relevant to interpreting an ambiguous contract provision—again provided such practice could be brought home to Randolph (the obverse side of the coin just minted in the preceding text discussion). But even apart from any failure to address that issue, Horvath's affidavit does not establish an industry custom. Horvath Aff. ¶¶ 8–9 say only that of the employers who had *similar* contract language, seven initially contributed for vacation and holiday hours while twelve did not. After demands were made on the latter twelve, seven of them then began to contribute. Five (including Randolph) are still holdouts. That sequence of events certainly does not rise to the level of an industry custom.

11. This Court need not resolve that question, given the following discussion in the text.

12. Fund has not sought to go back earlier than 1984. No view is expressed here on any issues that such an effort might raise.

tions—not only that Randolph would have sought to do so but also that Union would have agreed to Randolph's interpretation during the next round of bargaining. Because inferences must be drawn in Fund's favor on Randolph's motion, this Court must look at the equally likely prospect that further negotiations would have generated a provision that expressly *includes* holiday, vacation and overtime hours.

In sum, Randolph has presented no evidence of prejudice, even were this Court to assume an unreasonable delay. Neither of Randolph's remaining equitable defenses succeeds at this stage of the case.

### Conclusion

Each litigant has failed to establish the lack of a genuine issue of material fact on its claim. Both motions must be and are denied.[13] This action is set for a status hearing April 13, 1989 at 9:15 a.m. to discuss the procedures required to ready the case for trial.

---

**13.** This denial as to Randolph is premised on the litigants' agreement that one component of overtime—hours of any employee in any week in excess of 40—is not the subject of required Fund contributions.