**GARY HOBART WATER CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**and**

**United Steelworkers of America, Intervenor.**

**No. 74–1483.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1975.

Decided Feb. 21, 1975.

---

1. The parties do not dispute the application of Oklahoma law to this issue.

Fred H. Daugherty, Chicago, Ill., for petitioner.

Peter G. Nash, Gen. Counsel, Paul J. Spielberg, Atty., National Labor Relations Bd., Washington, D. C., for respondent.

Before CLARK, Associate Justice,* FAIRCHILD, Chief Judge and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

The question on this review and cross-application for enforcement of a Board

---

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

order is whether under the collective bargaining agreement involved, employees were engaged in protected activities when honoring another local union's picket line and participating in a sympathy strike.

## I

The Company supplies water on a wholesale basis to residential and industrial customers in Gary and Hobart, Indiana, and surrounding areas. At the time of the alleged unfair labor practices two locals of International Union of District 50, Allied and Technical Workers of the United States, represented the Company's employees. Local 13584 represented a unit consisting of operating or production and maintenance employees, sometimes referred to as the "men's unit," and had a bargaining relationship with the Company since 1952.

On September 5, 1968, the Board certified Local 14321 as the representative of a unit consisting of clerical employees, sometimes known as the "women's unit." Commencing on March 21, 1969, the women's unit struck the Company. During the strike, 70 of the 97 members of the men's unit honored the women's picket line. On April 1, 1969, the Company entered into a bargaining agreement with the women's unit for the period up to December 31, 1971.

On June 1, 1971, following expiration of the men's contract, the Local 13584 unit began an economic strike. Thirty-three of the 34 members of the women's unit honored the picket line. After warnings, the Company on June 17 discharged each of the women who honored the men's line. The discharged employees were replaced very slowly, one being replaced by June 17 and only 6 by August 17. At no time during the strike or through the summer of 1971 was there any disruption of service to the Company's customers.

On August 18, their Union on their behalf sent a telegram to the Company offering that the women return to work immediately, which offer was rejected by the Company. On August 30, the men's unit returned to work.

On October 27, the Company notified the Union that it was terminating the women's contract, believing that "the contract has already been terminated by operation of law." Prior to and after the contract expired by its terms on December 31, 1971, the Company refused to bargain with the Union in regard to the women's unit.

As a result of charges filed on behalf of the women's unit on June 21 and November 12, 1971, a complaint issued on January 4, 1972, alleging that the Company violated section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), by discharging 34 employees on June 17, 1971, because they engaged in a protected sympathy strike, and by refusing to reinstate them when openings occurred although they made an unconditional offer to return to work on August 18, 1971; violated section 8(a)(5), 29 U.S.C. § 158(a)(5), of the Act by terminating its collective bargaining agreement with the Union on October 27, 1971, and by refusing to bargain with the Union; and violated section 8(a)(1), 29 U.S.C. § 158(a)(1), of the Act by each of the foregoing acts.

On June 16, 1972, the Administrative Law Judge recommended that the complaint be dismissed. On November 30, 1972, the Board ordered that the complaint be dismissed but that jurisdiction be retained for further consideration if the dispute be not resolved with reasonable promptness either by amicable settlement in the grievance procedure or by arbitration. When the Company refused to follow the grievance procedure or to arbitrate, the Union moved for further consideration.

On May 21, 1974, the Board decided the matter on its merits. 210 N.L.R.B. No. 87 (1974).

The Board found that the contract's no-strike provisions did not waive the women's unit statutory right to observe the picket line of their brother union; that the discharge of the clericals on June 17, 1971, for such activity therefore violated sections 8(a)(1) and (3) of the Act; and that, since the unlawfully dis-

charged clericals remained employees within the meaning of the Act, the Union's majority status continued and the Company's subsequent refusal to bargain with it violated section 8(a)(5) of the Act.

The Board's order directed the Company to cease and desist from the unfair labor practices found or in any other manner interfering with, restraining, and coercing its employees in the exercise of their section 7 rights. Affirmatively, the Board's order required the Company to offer to the discharged clericals immediate and full reinstatement to their former positions or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights; and to make them whole for any loss of earnings they may have suffered by reason of the Company's discrimination against them. The Board's order further required the Company, upon request, to meet and bargain with the Union with respect to wages, hours, and other conditions of employment and embody in a signed agreement any understanding reached, and to post appropriate notices.

## II

The ordinary status of a sympathy striker was well set forth in NLRB v. Southern Greyhound Lines, Inc., 426 F.2d 1299, 1301 (5th Cir. 1970):

Initially, we think it obvious that when an employee, as a matter of principle, refuses to cross a picket line at his own employer's place of business, the employee, even though he is not a member of the striking union, has in effect plighted his troth with the strikers, joined in their common cause, and has thus become a striker himself. . . . The basis of the protection against discharge afforded an employee who refuses to cross a picket line at his employer's business is his status as a striker. Such an employee is therefore entitled to all the protections due under the National Labor Relations Act to those strikers with whom he has joined cause. Con-

versely, the employer's right to discipline such an employee to preserve the operation of his business is limited to those measures which he could lawfully use against strikers.

■ The right to strike guaranteed by section 7 of the Act, 29 U.S.C. § 157, may be surrendered or waived by appropriate provisions in the collective bargaining agreement. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 280, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

■ Correlatively, the right to engage in a sympathy strike or the right to refuse to cross a picket line may be waived in the same manner. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 80, 73 S.Ct. 519, 97 L.Ed. 832 (1953).

■ In this circuit we hold that "[i]n order to effectuate the relinquishment of a collective bargaining right under the provisions of a collective bargaining agreement, . . . the preferable rule requires that waiver be in 'clear and unmistakable language.'" NLRB v. Wisconsin Aluminum Foundry Co., 440 F.2d 393, 399 (7th Cir. 1971).

■ "[A] no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration." Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970).

■ "Absent an explicit expression of such [other] intention . . . the agreement to arbitrate and the duty not to strike should be construed as having coterminous application." Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974).

Here the no-strike-arbitration clauses read as follows:

[The parties agree that] there shall be no lockouts by the Company and there shall be no strike, stoppages of work or any other form of interference with any of the production or other operations of the Company by the Union or its members, and any and all disputes and controversies arising under or in

connection with the terms of provisions hereof shall be subject to the grievance procedure . . . [followed by a three-step grievance procedure resulting in binding arbitration under the third step]. (Article V).

\* \* \* \* \* \*

The Union agrees that there shall be no strikes, slowdowns or other interruption of work by any of its members during the term of this agreement, and the Company agrees that there shall be no lockout during the term of this agreement, and both parties agree that any disputes or differences shall be taken up under the Grievance and Arbitration procedures of this agreement. (Article XVIII, para. (2)).

■ This language indicates an intention to treat the no-strike clause as having application coextensively with that of the arbitration clause. That application is to "any and all disputes and controversies arising under or in connection with the terms of provisions" of the bargaining agreement.

■ The refusal to dishonor another local union's picket line or engaging in a sympathy strike in connection with another local's strike are not disputes or controversies arising under or in connection with the first local union's agreement and are therefore neither arbitrable nor subject to the no-strike provisions.

In Inland Steel Co. v. Local 1545, United Mine Workers of America, 505 F.2d 293 (7th Cir. 1974), we held that the district court could enjoin a sympathy strike or the honoring of a stranger union's picket line where the scope of arbitrable disputes had been fixed by the parties to the collective bargaining agreement, as follows:

[D]ifferences . . . [1] as to the meaning and application of the provisions of this agreement, or [2] should differences arise about matters not specifically mentioned in this agreement, or [3] should any local trouble of any kind arise at the mine. . . .

*Id.* at 297 n.5.

The court said of this agreement:

It is our conclusion that the "any local trouble of any kind aris[ing] at the mine" language contained in this exceptionally broad arbitration clause is itself expansive enough to cover the present disputes. A work stoppage which results from the honoring of stranger picket lines by company employees is certainly local trouble at the mine. Any other construction of this language would simply be ignoring the realities of the situation. Moreover, these parties agreed to arbitrate not only disputes concerning the meaning and application of the express provisions of the agreement but also disputes "about matters not specifically mentioned in this agreement." By the use of this terminology, we conclude that the parties mutually contracted to resolve any labor difficulties arising during the life of the agreement by the arbitration process, other than disputes which are "national in character."

*Id.* at 298.

The court relied upon clauses [2] and [3], *supra,* and in the present case the parties adopted nothing more than clause [1]. Clause [1] seems to us clearly not to affect the right to engage in a sympathy strike. In any event it is not clear and unmistakable language waiving that right.

■ Under these circumstances, the bargaining history between the Company and Union need not be examined in order to interpret the language of the collective bargaining agreement. Montana-Dakota Utilities Co. v. NLRB, 455 F.2d 1088, 1092 (8th Cir. 1972). But here, if we carry our consideration into that history, our conclusion is only reinforced. At the very time that the Local 14321 agreement was being negotiated, the women's unit was on strike and the men's unit was engaged in a sympathy strike, refusing to cross the women's picket line. Yet no specific language dealing with sympathy strikes was included in the women's unit agreement.

During the men's unit strike precipitating the women's discharges involved here, the Company submitted to the Union specific language covering sympathy strikes but the Union rejected that language. In other words the Company knew how to deal specifically with the subject when it so desired.

Even if we should assume, moreover, that the no-strike-arbitration clause of the Gary Hobart agreement was broad enough to make sympathy strikes and the honoring of a stranger local union's picket lines arbitrable, we would nevertheless be bound to enforce the Board's order inasmuch as it was entered only after the Board had on November 30, 1972 first found that

> [S]ince the resolution of the threshold issue (whether the no-strike clause of the grievance procedure of the collective-bargaining agreement protected the sympathy strike of the clerical unit) turns on the meaning and application of the no-strike clause, and the alleged unfair labor practices are so intimately intertwined with the interpretation of the contract, it would best effectuate the policies of the Act to defer to arbitration.

210 N.L.R.B. No. 87 at 1 (1974).

The Board retained jurisdiction and proceeded to determine the case on the merits after the Company refused to resolve the issues in dispute by settlement under the grievance procedure or by submission to arbitration. The Board found that the discharged employees had been engaged in protected activity and were entitled to relief.

We conclude that neither the employees nor their Union waived their right to engage in a sympathy strike. Kellogg Co. v. NLRB, 457 F.2d 519 (6th Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972).

The Board's findings and conclusions are supported by substantial evidence on the record considered as a whole.

Petition for review denied and order enforced.

FAIRCHILD, Chief Judge (concurring).

I agree that, absent an unequivocal waiver by the union, the Company's discharge of the Local 14321 employees for engaging in the concededly protected activity of observing another union's picket line, was violative of § 8(a)(3) of the National Labor Relations Act.

The "no strike" commitment present in the instant collective bargaining agreement does not specifically waive the right to engage in a sympathy strike. Accordingly, the Company is essentially arguing for the implication of such a term into the agreement's general proscription. Such protected rights should not be deemed waived by implication of law unless it is clear that the parties actually intended such a result.

I do not find Inland Steel Co. v. Local 1545, United Mine Workers of America, 505 F.2d 293 (7th Cir. 1974) controlling in the present case. As the court makes clear, the implication of a no-sympathy-strike agreement in Inland was founded upon an "exceptionally broad" and all-inclusive arbitration agreement. In the Gary-Hobart contract, the express no strike commitment does not specifically include a promise not to honor the picket line and the arbitration provisions are of narrower scope and application than those in Inland. I agree that the Board's order should be enforced.