## UNITED STATES STEEL CORPORATION, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

### No. 82–2714.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1983.

Decided June 30, 1983.

Before BAUER and WOOD, Circuit Judges, and ROSENN, Senior Circuit Judge*.

ROSENN, Senior Circuit Judge.

The question in this case is whether the United States Steel Corporation (U.S. Steel or the Company) committed unfair labor practices violating the National Labor Relations Act (the Act) by suspending employee Eugene Goldenfeld for a total of thirty-eight days because Goldenfeld refused to report for work on September 26 and 27, 1978, and urged other employees to do likewise.

On the dates in question, employees of the Elgin, Joliet and Eastern Railroad (EJE) were picketing at U.S. Steel's facility in Gary, Indiana (Gary Works), where Goldenfeld was employed. To demonstrate his support for the EJE employees' strike, Goldenfeld reported absent from work and distributed leaflets to his U.S. Steel co-workers, urging them to honor the EJE employees' picket line. Although an arbitrator determined that the Company was justified in suspending Goldenfeld for his actions, the Board found that the discipline violated section 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) (1976), because it interfered with Goldenfeld's right to engage in protected concerted activity.[1]

The Company petitions for review of the Board's order, contending that Goldenfeld was not engaged in concerted activity and that his actions were not protected by the Act because the employees' right to strike had been waived by an express no-strike clause in the collective bargaining agreement between the Company and the United Steelworkers Union. The Company also argues that the Board should have deferred to the arbitration award. Because we agree with the Company's waiver argument, we

S.G. Clark, Pittsburgh, Pa., for petitioner.

Edward S. Dorsey, Elliott Moore, N.L.R.B., Washington, D.C., for respondent.

---

* Honorable Max Rosenn, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. Because the parties elected to waive a hearing before an administrative law judge and stipulated to most of the relevant facts, the Board decided the case entirely on the basis of the stipulations and exhibits. The only oral testimony contained in the record is the testimony of the witnesses who appeared at the arbitration proceeding. The Board issued its order on September 24, 1982. *See* 264 N.L.R.B. No. 10.

grant the petition for review and deny enforcement of the Board's order.

## I.

In September 1978, Eugene Goldenfeld was employed by U.S. Steel as a journeyman motor inspector at the Company's Gary Works steel mill. He was a member of Steelworkers Union Local 1014. All Gary Works' employees, as well as employees at the Company's other basic steel mills, were covered by a collective bargaining agreement between the Company and the Steelworkers (the basic labor agreement) dated August 1, 1977. This agreement contained a broad no-strike clause. The contract also provided for a four-step grievance procedure, culminating in binding arbitration, that was to be followed for the settlement of all complaints and grievances. The preamble to the contract indicated that the purpose of the agreement was "to promote orderly and peaceful relations with the employees, to achieve uninterrupted operations in the plants, and to achieve the highest level of employee performance consistent with safety, good health, and sustained effort."

On September 26, 1978, employees of the EJE Railroad belonging to the Brotherhood of Railway and Airline Clerks (BRAC) set up a picket line at U.S. Steel's Gary Works facility. EJE operates tracks, offices, and switching equipment at the Gary Works, and BRAC's picketing was aimed at EJE. The purpose of the EJE employees' picket line was to protest EJE's decision to contribute to a fund that was being used to aid the Norfolk and Western Railroad, which was resisting a strike. The picketing by EJE employees apparently constituted lawful protected concerted activity under the Act.

Goldenfeld observed the EJE pickets as he arrived for work shortly before 7:00 A.M. on September 26. After speaking with the striking EJE employees, Goldenfeld decided to honor their picket line in order to further labor solidarity. Goldenfeld telephoned his supervisor and informed him that he would not enter the U.S. Steel plant to report for work. He also telephoned Jack Parton, president of Steelworkers Local 1014. Goldenfeld asked Parton to encourage other Gary Works employees to honor the EJE picket line, but Parton refused this request.

While at home on September 26, Goldenfeld drafted and typed a leaflet explaining his views on the EJE employees' strike and urging other U.S. Steel employees to honor the picket line. He mimeographed this leaflet himself and distributed it to the Company's employees at the Gary Works later that day.

The following morning, September 27, Goldenfeld again encountered the EJE strikers at the Gary Works and telephoned his supervisor to report off from work for a second day. He spoke to a foreman who informed him that he had been suspended for three days on the ground of absence from duty without permission or excuse. Goldenfeld distributed more leaflets at the plant later on September 27. As a result of his distribution of leaflets, one other Gary Works employee elected not to work.

The picketing ended on September 29, 1978, the last day of Goldenfeld's suspension. When Goldenfeld reported for work on September 30, however, he was informed that the Company had suspended him for an additional thirty-five days for engaging in "activities designed to encourage other employees to violate" the no-strike provision of the collective bargaining agreement between U.S. Steel and the Steelworkers Union.

Goldenfeld filed two grievances with the Company regarding his suspensions. The grievances progressed through the grievance procedure and ultimately were presented to an arbitrator. At the arbitration hearing, the Union contended on Goldenfeld's behalf that Goldenfeld was engaged in protected concerted activity when he honored the EJE picket line and distributed the leaflets. On May 30, 1979, the arbitrator upheld Goldenfeld's suspensions, reasoning that Goldenfeld's conduct was not protected by the Act because the no-strike clause in the collective bargaining agree-

ment prohibited employees from participating in and promoting sympathy strikes.

Notwithstanding the arbitrator's decision, the Board's Regional Office issued a complaint against U.S. Steel, alleging that the Company committed unfair labor practices by disciplining Goldenfeld. The case was transferred directly to the Board which, in a 3–2 decision, found that the suspensions violated section 8(a)(1) of the Act. The Board majority declined to defer to the arbitrator's decision upholding the suspensions, believing that the arbitration award was repugnant to the policies of the Act.[2]

On appeal, the Company raises a three-pronged challenge to the Board's finding that its suspension of Goldenfeld interfered with Goldenfeld's right to engage in protected concerted activity. First, the Company contends that Goldenfeld was not engaged in concerted activity because he acted alone and on the basis of his personal beliefs about strikes. Second, the Company argues that Goldenfeld's activity was not protected because the contractual no-strike clause effectively waived his right to participate in sympathy strikes. Finally, the Company argues that the Board never should have decided the unfair labor practice question but instead should have deferred to the arbitrator's decision upholding the Company's disciplinary actions.[3]

## II.

Section 8(a)(1) of the Act prohibits employers from interfering with employees' participation in union and other concerted activity protected by section 7 of the Act. The Company argues that the suspensions of Goldenfeld did not violate this provision

because Goldenfeld's activities were neither concerted nor protected.

### A.

The Company contends that Goldenfeld was acting alone when he honored the BRAC picket line and distributed leaflets in support of the picket line. This argument need not detain us. It is true that Goldenfeld's activities were unassisted by other U.S. Steel employees. He wrote, typed, and printed his leaflet alone, and of all the employees who received the leaflet, only one elected not to report to work. Nonetheless, Goldenfeld's activities were clearly "concerted" within the meaning of the Act. Because the whole purpose of his conduct was to further labor solidarity by demonstrating support for the EJE employees who had established the picket line, Goldenfeld was acting in concert with the strikers. Section 2(3) of the Act, 29 U.S.C. § 152(3), expressly provides that an employee may act "in concert" with persons employed by another employer. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 564–65, 98 S.Ct. 2505, 2511–12, 57 L.Ed.2d 428 (1978). Moreover, to the extent that Goldenfeld's distribution of leaflets was an attempt to induce group action on the part of his fellow U.S. Steel employees, his activities constituted concerted activity. *See NLRB v. Town & Country LP Gas Service Co.*, 687 F.2d 187, 191 (7th Cir. 1982); *Indiana Gear Works v. NLRB*, 371 F.2d 273 (7th Cir.1967). That another U.S. Steel employee joined Goldenfeld in honoring the picket line evidences the concerted nature of Goldenfeld's actions.[4]

### B.

Among the activities protected by section 7 of the Act is the right of an employee to honor a lawful picket line at

---

**2.** Chairman Van DeWater and Member Hunter, in dissent, indicated that they would defer to the arbitration award, believing that the arbitrator had a reasonable basis for finding that the right to refuse to cross the picket line had been waived. They also rejected the majority's reliance on the coterminous application doctrine.

**3.** Because of our disposition of this appeal, we do not reach the question whether the Board erred in not deferring to the arbitration award

rendered under the basic collective bargaining agreement.

**4.** The Company is simply incorrect in suggesting that Goldenfeld's complaint was purely personal and was not communicated to other employees or to Company management. The decision in *NLRB v. Pincus Brothers, Inc.-Maxwell*, 620 F.2d 367 (3d Cir.1980), is distinguishable in this regard.

his employer's place of business. *See NLRB v. Union Carbide Corp.,* 440 F.2d 54, 56 (4th Cir.), *cert. denied,* 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed.2d 55 (1971). This right applies even when the employee refusing to cross the picket line is not a member of the picketing union, *see NLRB v. Difco Laboratories, Inc.,* 427 F.2d 170, 171–72 (6th Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 65 (1970); *NLRB v. Southern Greyhound Lines,* 426 F.2d 1299, 1301 (5th Cir. 1970). In addition, this court has held that an employee may refuse to. cross a picket line that he encounters in the course of his duties at the premises of his employer's customer. *NLRB v. Browning-Ferris Industries, Chemical Services, Inc.,* 700 F.2d 385 (7th Cir.1983). *See also NLRB v. Southern California Edison Co.,* 646 F.2d 1352, 1363–64 (9th Cir.1981). Thus, employee Goldenfeld arguably may have had a statutory right to honor the BRAC picket line and to distribute leaflets in support of that strike. *See generally NLRB v. Peter Cailler Kohler Swiss Chocolates Co.,* 130 F.2d 503, 505–06 (2d Cir.1942).

The Company contends, however, that Goldenfeld's right to engage in a sympathy strike was waived by the express no-strike provision in the collective bargaining agreement. between it and the Steelworkers Union. According to the Company, Goldenfeld's conduct violated the terms of the contract and thus was unprotected.

The right of employees to engage in a sympathy strike, like most statutory rights, can be relinquished by a union in a collective bargaining agreement. The Board, however, has applied a very "strict standard to assess alleged waivers of the fundamental right to strike in general, and the right to engage in sympathy work stoppages in particular." *Operating Engineers, Local 18 (Davis-McKee, Inc.),* 238 N.L.R.B. 652 (1978). In the Board's view, "broad no-strike clauses, without more, are insufficient to establish waiver of the right to engage in sympathy strikes." *Id.* at 654. Rather, any waiver of the right to engage in a sympathy strike may be found only "in express contractual language or in unequiv-

ocal extrinsic evidence bearing upon ambiguous contractual language." *Id.* at 652.

The Board's position is predicated upon the doctrine of coterminous application. Under this doctrine, the Board normally will read a no-strike clause "to prohibit only those strikes which are over disputes covered by the contractual arbitration procedure." *United States Steel Corp. and Eugene Goldenfeld,* 264 N.L.R.B. No. 10. Because the underlying sympathy strike by nature is not over a matter that is arbitrable under the sympathy strikers' contract with their employer, the Board has consistently refused, as it has here, to find sympathy strikes encompassed in broad no-strike pledges.

An analysis of the origin and limitations of the doctrine of coterminous application may be helpful in understanding the issue presented in this case. The doctrine, originating in the construction of contracts that were devoid of any express no-strike pledge, was intended to fill a void in cases where an employer had agreed to arbitrate certain disputes and differences with the union. In *Teamsters Local 174 v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the Supreme Court held that in the absence of a no-strike clause, the presence of an arbitration clause in a collective bargaining agreement will give rise to an implied obligation not to strike over arbitrable disputes. In *Gateway Coal Co. v. UMW,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Court refined this rule, holding that where an obligation not to strike is implied, "the agreement to arbitrate and the [implied] duty not to strike should be construed as having coterminous application." *Id.* at 382, 94 S.Ct. at 639. Coterminous application means nothing more than that a court will not imply a no-strike obligation broader than the arbitration clause from which it emanates.

The theoretical basis for coterminous application is that a no-strike clause is considered the quid pro quo of an arbitration clause in a labor contract. Even when a contract does not contain a no-strike clause, the presence of an arbitration clause indi-

cates the parties' intent to settle disputes peacefully. Under these circumstances, therefore, "it is only fair to imply a duty not to strike. In the absence of language to the contrary, it makes sense to limit the obligation not to strike to the scope of the arbitration clause from which it draws its force." *Delaware Coca-Cola Bottling Co. v. General Teamsters Local 326*, 624 F.2d 1182, 1192 (3d Cir.1980) (Rosenn, J., concurring).

■ The doctrine of coterminous application may also be invoked with respect to contracts containing an express no-strike clause when injunctive relief is sought for a violation of the no-strike obligation. Ordinarily, section 4 of the Norris-LaGuardia Anti-Injunction Act prohibits the issuance of restraining orders against peaceful work stoppages. *See* 29 U.S.C. § 104 (1976).[5] The Supreme Court, however, has carved out a narrow exception to this prohibition for strikes in breach of contract where a union has agreed to arbitrate the underlying dispute. *See Buffalo Forge Co. v. United Steelworkers Union*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).[6] These cases relied on section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1976), which authorizes federal courts to enforce bargaining agreements. Thus, injunctive relief is permissible under these cases where the dispute between the parties is within the scope of the arbitration clause.

■ The instant case is significantly different from the cases in which the doctrine of coterminous application has conventionally been applied. We are not confronted with the question whether an obligation not to strike may be implied from an arbitration clause. Rather, the bargaining agreement between the Company and the Steelworkers contains an express no-strike clause. Nor is there any issue in this case of whether Goldenfeld's participation in the sympathy strike could be enjoined under the rule of *Buffalo Forge Co. v. United Steelworkers, supra,* on the ground that the strike was over an arbitrable dispute. Because we are not concerned here with injunctive relief but only with whether Goldenfeld was lawfully suspended for violating the broad no-strike clause in his collective bargaining agreement, the limitations *Buffalo Forge* placed on the availability of injunctive relief against a strike in breach of a contractual no-strike clause do not apply. *See NLRB v. Keller-Crescent Co.,* 538 F.2d 1291, 1296 (7th Cir.1976) (recognizing that a strike may violate a contract or be illegal even though the employer cannot secure injunctive relief against the strike). *See also Hyster Co. v. Independent Towing and Lifting Machine Association*, 519 F.2d 89 (7th Cir.1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3220, 49 L.Ed.2d 1216 (1976). Thus, the principle of coterminous application, which limits the scope of a no-strike obligation to arbitrable disputes, is not pertinent here. In deciding whether the Company was free to discipline Goldenfeld, we need only ascertain the meaning of the express no-strike clause.

Of course, in cases where an arbitration clause and an express no-strike clause are closely interwoven, it may be reasonable to infer that the parties intended the two provisions to have the same scope. Thus, in *Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284 (7th Cir.), *cert. denied*, 423 U.S.

---

**5.** This Act reads in pertinent part:

No court of the United States shall have jurisdiction to issue any restraining order . . . in any case involving or growing out of any labor dispute to prohibit any person . . . from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing *to perform any* work or to remain in any relation of employment . . . .

47 Stat. 70, 29 U.S.C. § 104.

**6.** The Court explained in *Buffalo Forge:*

The driving force behind *Boys Markets* was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties. Only to that extent was it held necessary to accommodate § 4 of the Norris-LaGuardia Act to § 301 of the Labor Management Relations Act and to lift the former's ban against the issuance of injunctions in labor disputes.

428 U.S. at 407, 96 S.Ct. at 3147.

925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975), there was a single provision that both required arbitration of certain grievances and prohibited strikes. The court held that the express no-strike clause extended only as far as the duty to arbitrate. *See also NLRB v. C.K. Smith & Co.,* 569 F.2d 162 (1st Cir.1977), *cert. denied,* 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). In the instant case, however, the no-strike clause is functionally independent of the arbitration clause of the contract. The two clauses appear in separate sections of the collective bargaining agreement that carry unrelated topical headings. Section 4, containing the broad no-strike clause, is entitled "Responsibilities of the Parties" and section 7 is entitled "Arbitration." The latter is preceded by section 6, entitled "Adjustment of Complaints and Grievances," which contains a detailed grievance procedure. Among the responsibilities of the parties set forth in section 4 of the contract is the following provision:

3. There shall be no strikes, work stoppages, or interruption or impeding of work. No officer or representative of the union shall authorize, instigate, aid, or condone any such activities. No employee shall participate in any such activities.

■ Independent of the "general rule that courts 'owe no particular deference to the Board' on matters of contract interpretation," *Pacemaker Yacht Co. v. NLRB,* 663 F.2d 455, 458 (3d Cir.1981) (quoting *Dow Chemical Co. v. NLRB,* 636 F.2d 1352, 1358 (3d Cir.1980), *cert. denied,* 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981)), we believe that the Board erred as a matter of law when it concluded that the express no-strike clause did not bar Goldenfeld's sympathy strike activity. An examination of the terms of the collective bargaining agreement and the background under which it was negotiated persuades us that there was a clear and unmistakable waiver of the employees' right to engage in a sympathy strike.

First, this no-strike clause is not limited—either by its own language or by other contractual language—to arbitrable disputes only. Second, in the introductory provisions of the contract, which cover the various U.S. Steel plants, the parties expressed their acute awareness "of the impact upon the industry and its employees of the sizable penetration of the domestic steel market by foreign producers," Labor Contract of August 1, 1977, sec. 1, p. 4, and acknowledged the necessity for them "to work cooperatively to meet the challenge posed by principal foreign competitors." *Id.* To implement this expression of purpose, they provided for the establishment at each plant of a joint advisory Committee on Employment Security and Plant Productivity. According to the agreement, "[T]he function of the Committee shall be to advise with plant management concerning ways and means of improving productivity and developing recommendations for stimulating [the plant's] growth so as to promote the purpose of the parties ... and also promote orderly and peaceful relations with the employees, to *achieve uninterrupted operations in the plants,* ... and to achieve the desired prosperity and progress of the Company and its employees." *Id.* at 5 (emphasis supplied).

Against this background of dire foreign competition and the need to promote efficiency, continuity, and stability in operations, the parties wrote a broad no-strike clause into their contract. The clause is not confined to strikes over arbitrable grievances; it plainly proscribes all strikes and work stoppages. The clause is wholly independent of the separate arbitration provisions in the contract; it makes no reference whatsoever to the arbitration clause or to arbitrable disputes. In its very first section, the contract explicitly states that one of the objectives of the agreement is the promotion of "orderly and peaceful relations with the employees" and the achievement of "uninterrupted operations in the plants." It is apparent that the parties intended to preclude all work stoppages, and certainly did not intend to leave an exception for sympathy strikes.

With a collective bargaining agreement structured to meet the challenge of foreign

competition and a goal of "uninterrupted operations" stated and reiterated in clear and unmistakable terms, it is sheer naivete to maintain, as the Board does here, that the broad no-strike clause did not clearly and unmistakably waive the right to honor a stranger picket line with whom neither the Company nor the Union had any dispute. In short, it is evident that the no-strike clause in this collective bargaining agreement was not merely given in exchange for an undertaking to arbitrate disputes arising under the contract. Instead, the Union agreed not to strike in order to assure the Company of the production and continuity of operations necessary for effective competition with foreign steel producers, expecting that this would ultimately redound to the benefit of the Union and its members.[7] We reject the Board's "slavish application of the principle [of coterminous application] to the no-strike clause before us." *W–I Canteen Service, Inc. v. NLRB,* 606 F.2d 738, 744 (7th Cir.1979).

The failure of the no-strike clause to refer expressly to sympathy strikes is not conclusive, as the Board maintains. The question is simply whether the parties intended to preclude sympathy as well as work-related strikes. *See W–I Canteen Service, Inc. v. NLRB, supra,* 606 F.2d at 745 (the Board "cannot find support in any judicial or Board decisions for a rigid requirement that the no-strike clause contain the specific term 'sympathy strike' before finding a waiver. A number of cases have interpreted general no-strike clauses to preclude sympathy strikes"). Surely, if the Union were willing to waive the right to strike over disputes concerning wages,

hours, and working conditions directly affecting its members, absent any language to the contrary, any argument that it did not intend to waive the right to strike over a dispute that did not directly concern them is paradoxical.

*Gary Hobart Water Corp. v. NLRB, supra,* 511 F.2d 284, and *Hyster Co. v. Independent Towing and Lifting Machine Association, supra,* 519 F.2d 89, relied on by the Board, are distinguishable from the instant case. In *Gary Hobart,* not only was the contract lacking any acknowledgement of the industrial necessity to avoid work stoppages, but the no-strike clause and the grievance and arbitration procedures of the contract were fundamentally related. They were contained in the same clause and were directly intertwined.[8] Thus, it was reasonable there to infer that the arbitration and no-strike provisions had the same scope.

*Hyster,* unlike the instant case, involved an action to enjoin several unions and their members from engaging in work stoppages that resulted from refusals to cross a stranger union's picket lines. In order to obtain an injunction, the employer had to establish that the union's conduct gave rise to an arbitrable issue under the collective bargaining agreement so as to come within the exception to the anti-injunction provision of the Norris-LaGuardia Act established by *Boys' Markets, supra.* Here, the employer seeks no injunction and thus is not required to show that the underlying dispute is arbitrable before it may suspend an employee for violating the no-strike clause of the collective bargaining agreement.

---

**7.** Extrinsic evidence offers additional support for our interpretation of the contractual intent of the parties. When Goldenfeld telephoned Parton, the president of Steelworkers Local 1014, and asked him to encourage other plant employees to honor the EJE picket lines, Parton refused. When Goldenfeld sought arbitration, no officer of the Union testified in support of his position on the no-strike clause.

**8.** The *Gary Hobart* clause provided:
[The parties agree that] there shall be no lockouts by the Company and there shall be no strikes, stoppages of work or any other form of interference with any of the production or other operations of the Company by

the Union or its members, and any and all disputes and controversies arising under or in connection with the terms of provisions hereof shall be subject to the grievance procedure ... [followed by a three-step grievance procedure resulting in binding arbitration under the third step].
*Gary Hobart Water Corp. v. NLRB, supra,* 511 F.2d at 287–88. Interestingly, the Board in *Gary Hobart* was willing to defer to arbitration but the Company, unlike the employer in this case, refused to resolve the dispute under the grievance procedure or by submission to arbitration. *Id.*

No federal labor policy supports the restrictions that the Board seeks to graft onto the collective bargaining process. Collective bargaining is the heart of industrial relations and preventing the interruption of work is a joint objective of both management and labor. "[T]o require specific enumeration in a no-strike clause of all possible nonarbitrable disputes that might result in a work stoppage would place an unjustified obstacle on the ability of employers to bargain for an across-the-board no-strike clause and on the employees' ability to gain concessions in return for such a pledge." *Pacemaker Yacht Co. v. NLRB, supra,* 663 F.2d at 460.

We therefore hold that where a broad no-strike clause is functionally independent of an arbitration clause in a labor contract and the contract shows that the no-strike obligation was not given merely in exchange for the duty to arbitrate but because of the parties' common interest in achieving uninterrupted plant operations, the no-strike clause constitutes a clear and unmistakable waiver of an employee's right to engage in a sympathy strike. The Company's petition for review of the Board's order is granted.

ENFORCEMENT DENIED.