INDIANAPOLIS POWER & LIGHT COMPANY, Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner,

and

Local Union 1395, International Brotherhood of Electrical Workers, Intervenor.

Nos. 88–3503, 89–1735.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 14, 1989.

Decided March 15, 1990.

---

Herbert C. Snyder, Jr., Richard P. Steele, Barnes & Thornburg, Fort Wayne, Ind., for Indianapolis Power and Light Co.

Aileen A. Armstrong, Robert F. Mace, N.L.R.B., Appellate Court—Enforcement Litigation, Barbara A. Atkin, Rosemary M. Collyer, Gen. Counsel, N.L.R.B., Washington, D.C., William T. Little, N.L.R.B., Indianapolis, Ind., Robert D. Kurnick, Sherman, Dunn, Cohen, Leifer & Counts, Washington, D.C., for N.L.R.B.

Laurence J. Cohen, Robert D. Kurnick, Sherman, Dunn, Cohen, Leifer & Counts, Washington, D.C., for Local Union 1395, Intern. Broth. of Elec. Workers.

Peter G. Nash, Dixie L. Atwater, Ogletree, Deakins, Nash, Smoak & Stewart, Stephen A. Bokat, Mona C. Zeiberg, Washington, D.C., for Chamber of Commerce of U.S., amicus curiae.

Before CUMMINGS, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Indianapolis Power & Light Company appeals the National Labor Relations Board's finding that it violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act by disciplining a union employee for his refusal to cross a picket line at the premises of one of the Company's customers. In reaching this conclusion, the Board found that extrinsic evidence revealed that the parties intended to exclude sympathy strikes from the no-strike provision in the Company's collective bargaining agreement with the Union. The Board cross-petitions for enforcement of the order, and Local Union 1395, International Brotherhood of Electrical Workers, has intervened on behalf of the Board. Because the Board's

findings are supported by substantial evidence, we grant enforcement.

## I.

This case is before us in a somewhat unusual posture. After the Board's initial decision in this matter, *Indianapolis Power & Light Company*, 273 NLRB 1715 (1985) (*Indianapolis Power I*), the District of Columbia Circuit denied enforcement of the Board's order and remanded the case back to the Board. *Electrical Workers IBEW Local Union 1395 v. NLRB*, 797 F.2d 1027, 1036 (D.C.Cir.1986). The Board then rendered a supplemental decision in favor of the Union, *Indianapolis Power & Light Company*, 291 NLRB 145 (1988) (*Indianapolis Power II*), the appeal of which is now before us.

The facts of this case are uncontested. Since 1972, Indianapolis Power & Light Company (the "Company" or "IPALCO") and Local Union 1395, the International Brotherhood of Electrical Workers (the "Union"), have entered into a series of collective bargaining agreements, each of which contained a broad no-strike provision.[1] On August 17, 1983, IPALCO assigned employee Herbert King, a member of the Union, to read a meter and change a tape at a local telephone company. When King arrived at the telephone company, he encountered a lawful picket line by employees of the telephone company. When he refused to cross the picket line, the Company suspended him for two and one-half weeks and warned him that refusal to cross a picket line to perform work was cause for immediate termination.

The Union filed unfair labor practice charges against IPALCO on King's behalf alleging that the Company violated Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3) (1982) (the "Act"). After a hearing, the Administrative Law Judge (the "ALJ") is-

sued a ruling sustaining the complaint. The ALJ noted that "under current Board authority, broad no-strike clauses without more are insufficient to establish a waiver of the right ... to engage in sympathy strikes." *See Operating Engineers Local 18 (Davis–McKee, Inc.)*, 238 NLRB 652 (1978). Accordingly, the ALJ concluded that the parties' no-strike provision would not effectively waive the right to honor picket lines unless extrinsic evidence of the parties' specific intent conclusively established such a waiver. To determine whether such a waiver existed here, the ALJ examined the extrinsic evidence of the parties' bargaining history and past practices and found that it "falls far short of establishing the parties' clear intent to waive this statutory right." The ALJ concluded that the extrinsic evidence was "equivocal and uncertain" and supported the conclusion "that the parties [had] never reached agreement on whether or not employees would have the right to refrain crossing picket lines." Therefore, since the Union had not clearly and unmistakably waived the right to engage in sympathy strikes, the ALJ concluded that the Company had violated the Act by disciplining King.

On January 31, 1985, the Board issued a decision reversing the ALJ and finding that the Company did not violate Sections 8(a)(1) and 8(a)(3) of the Act by disciplining King because the Union had waived the statutory right to engage in sympathy strikes. *Indianapolis Power I*, 273 NLRB 1715, 1715–16 (1985). The Board held that a broad no-strike clause should be properly read as clear and unmistakable evidence that employees intended to waive the right to engage in sympathy strikes unless the contract as a whole or extrinsic evidence demonstrates that the parties intended otherwise. In so holding, the Board overruled *Operating Engineers Local 18 (Davis–McKee, Inc.)*, 238 NLRB 652 (1978), and its progeny, which held that "broad no-strike

---

1. Each of the collective bargaining agreements between the parties contained the following no-strike clause:

    During the term of this agreement, and any extension or renewal thereof, the Union and each employee covered by the agreement

agree not to cause, encourage, permit, or take part in any strike, picketing, sit-down, stay-in, slow-down, or other curtailment of work or interference with the operation of the Company's business, and the Company agrees not to engage in a lockout.

clauses, without more, are insufficient to establish waiver of the employee's right to engage in sympathy strikes."

In reaching its decision, the Board agreed with the ALJ's determination that the extrinsic evidence of the parties' intent was uncertain and inconclusive. The Board did not, however, discuss or analyze the ALJ's findings that the parties had expressed different meanings about the scope of the no-strike provision at the time they entered into the agreement. Instead, the Board regarded the no-strike clause's plain meaning as dispositive. Finding the extrinsic evidence insufficient to demonstrate a mutual intent to exclude sympathy strikes from the no-strike provision, the Board concluded that the no-strike provision clearly and unmistakably waived the employees' right to participate in sympathy strikes.

Upon petition for review of the Board's order by the Union, the United States Court of Appeals for the District of Columbia Circuit agreed with the Board that the language of the no-strike provision and the collective bargaining agreement, standing alone, could be construed as a waiver of the right to engage in sympathy strikes. *Electrical Workers IBEW Local Union 1395 v. NLRB*, 797 F.2d 1027, 1036 (D.C. Cir.1986). The court found, however, that the Board, in holding that the language of the no-strike clause excluded sympathy strikes, had failed to give the parties' intent controlling weight. In warning that "the intent of the parties to collective bargaining agreements is not to be discerned by reference to 'abstract definitions unrelated to the context in which the parties bargained,'" the court cautioned that "The Board may not, in the guise of enforcing the 'plain meaning' of contractual language, erect an inflexible presumption on an issue turning on the parties' *actual* intent." *Id.* at 1036 (citation omitted). The court went on to state that to properly discern the parties' actual intent, the Board must look to whether that intent is established by the language of the clause itself, by inferences drawn from the contract as a whole, or by extrinsic evidence. The court observed that in the Board's three-page decision it had failed "to discuss relevant

and perhaps dispositive evidence of the parties' intent," thereby apparently "assum[ing] the very point at issue, i.e., whether sympathy strikes fall within the [no-strike] clause's purview." *Id.* The court particularly noted the Board's failure to address the ALJ's factual finding that during contract negotiations "the parties had agreed to disagree over whether sympathy strikes were covered by the [no-strike] clause." "If accepted," the court stated, "this factual finding would be controlling: absent mutual consent on the issue, there could be no binding contractual commitment ... and *a fortiori*, no clear and unmistakable waiver of the right to honor picket lines." Accordingly, the court remanded the case to the Board for a determination of the parties' actual intent through an examination of extrinsic evidence, in particular, evidence of the parties' bargaining history.

In its supplemental decision on remand, the Board reaffirmed its conviction that a broad no-strike clause should properly be read to encompass sympathy strikes unless the contract as a whole or extrinsic evidence demonstrates otherwise. In light of the District of Columbia Circuit's interpretation of the *Indianapolis Power* rule, the Board also clarified the role to be played by extrinsic evidence: "In deciding the issue of whether sympathy strikes fall within a no-strike provision's scope, the parties' actual intent is to be given controlling weight and extrinsic evidence should be considered an integral part of the analysis." With these principles serving as its guide, the Board found, in agreement with the ALJ, that the extrinsic evidence established that the parties had "agreed to disagree" throughout negotiations over the collective bargaining agreement regarding whether sympathy strikes were covered by the no-strike clause. Based on this finding, the Board concluded that the Union had not clearly and unmistakably waived the right of company employees to engage in sympathy strikes and thus the right was not included within the scope of the broad no-strike clause. Accordingly, the Board found that the Company violated Sections

8(a)(1) and (3) of the Act by suspending and threatening to discharge King for engaging in such a sympathy strike.[2] IPALCO then filed its petition for review with this Court.

An examination of the Board's holding on remand reveals the practical effect of the District of Columbia Circuit's opinion on the Board's *Indianapolis Power* rule. The Board stated in *Indianapolis Power I* that a broad no-strike clause should properly be read to encompass sympathy strikes unless the contract as a whole or extrinsic evidence demonstrates otherwise. The District of Columbia Circuit interpreted the rule to mean that when faced with a broad no-strike clause, the Board must turn to extrinsic evidence to determine whether the parties agreed to *include* sympathy strikes within the no-strike provision. Since the Union's waiver of the employees' statutory rights must be clear and unmistakable, the extrinsic evidence must manifest a clear mutual intent to include sympathy strikes within the scope of the no-strike clause or else the clause will not be read to waive sympathy strike rights. Apparently, therefore, where there is extrinsic evidence of the parties' intent, the inquiry has come full-circle back to the *Davis–McKee* approach; the burden is on the employer to show that the parties intended to include sympathy strikes within the purview of the no-strike clause. A broad no-strike provision by itself is not sufficient to waive the right to engage in sympathy strikes if extrinsic evidence of the parties' intent does not demonstrate that the parties' mutually agreed to include such rights within the breadth of the no-strike clause.

## II.

■ As an initial matter, we must define the proper scope of our review. More precisely, we must determine what effect we should give to the District of Columbia Circuit's affirmance of the Board's construction of a broad no-strike clause in this case. The Chamber of Commerce of the United States of America, as *Amicus Curiae*, urges us to review the holding of the District of Columbia Circuit in affirming the Board in *Indianapolis Power I*. Amicus urges us to reverse the Board and the District of Columbia Circuit and hold that a broad no-strike clause waives the right to engage in sympathy strikes unless the extrinsic evidence reveals that the parties *mutually agreed* to modify that language and *exclude* sympathy strikes from its coverage. Not surprisingly, the Union urges us to take a different route. The Union argues that we should not address the rule of contract construction as affirmed by the District of Columbia Circuit but instead adhere to the doctrine of the law of the case which counsels that we limit our review to whether the Board's finding was in accordance with the earlier appellate court's opinion and instructions on remand.

This Court has long held that "matters decided on appeal become the law of the case to be followed ... on second appeal, in the appellate court, unless there is plain error of law in the original decision." *Unity Ventures v. County of Lake*, 894 F.2d 250, 252 (7th Cir.1990) (quoting *Kaku Nagano v. Brownell*, 212 F.2d 262, 263 (7th Cir.1954)). Unlike *res judicata*, the law of the case doctrine is discretionary: "the doctrine is a self-imposed prudential limitation rather than a recognition of a limitation of the court's power." 1B Moore's Federal Practice ¶ 0.40[10] at 573 (2d ed. 1980). The doctrine is a "rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter." *Evans v. City of Chicago*, 873 F.2d 1007, 1014 (7th Cir.1989) (quoting *Barrett v. Baylor*, 457 F.2d 119, 123 (7th Cir.1972)). Our previous decisions tell us that the "doctrine should not be lightly disregarded," *Shakman v. Dunne*, 829 F.2d 1387, 1392 (7th Cir.1988), and that

**2.** The Board's order on remand requires the Company to cease and desist from the unlawful conduct found and from in any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the Act. The order also requires the Company to make employee King whole for any lost wages resulting from his unlawful suspension, to expunge any reference thereto from its files, and to post an appropriate notice.

we should not reconsider a previous decision in the same case "unless one of three 'exceptional circumstances' exists: the evidence in a subsequent trial was substantially different; controlling authority has since made a contrary decision of law applicable to such issues; or the decision was clearly erroneous, and would work a substantial injustice." *Evans*, 873 F.2d at 1014 (citations omitted). The doctrine would seem to apply with added force in the instant situation where the case is now before a second appellate court because "the utility of such a transfer would be seriously compromised if the fact of transfer were to be treated as an invitation to seek a 'second opinion' on every pre-transfer ruling ..." 1B Moore ¶ 0.404[4.2].

While Amicus urges us to reconsider the *Indianapolis Power* rule, it advances no "exceptional circumstances" or compelling reasons for discarding the doctrine of the law of the case. It is undisputed that the parties had a full opportunity to litigate the issue before the earlier appellate tribunal. As the Board noted, "the court rejected every legal argument the Union could muster against the *Indianapolis Power* rule." On remand, the Company raised several attacks to the Board's rule, each of which were rejected by the Board. Furthermore, neither Amicus nor the Company contend that "controlling authority has since made a contrary decision of law applicable" to this issue. Finally, far from being clearly erroneous, we believe that the *Indianapolis Power II* rule is reasonable and consistent with the Act. The rule gives effect to the literal, all-encompassing language of the parties' own agreement unless the extrinsic evidence demonstrates that the parties' intended otherwise. Thus, the rule reasonably accommodates two important policies: that a waiver of statutory rights is not to be lightly inferred, *International Union, UAW v. NLRB*, 802 F.2d 969, 973 (7th Cir.1986), and that parties should be free to bargain and enter into an agreement reflecting their bargain. *Electrical Workers IBEW Local 803 v. NLRB*, 826 F.2d 1283, 1290 (3rd Cir.1987). Moreover, the rule takes into account the court's admonitions that waiver turns on actual intent, that the Board should not read a

broad no-strike clause as establishing an irrebuttable presumption of waiver, and that the Board should carefully consider extrinsic evidence bearing on the parties' actual intent in analyzing waiver. In sum, therefore, we believe that sound principles of economy and fairness dictate that we respect the earlier appellate ruling in this case and, consistent with the doctrine of the law of the case, we will not allow the parties to relitigate what has already been decided. Our review, therefore, is limited to whether the Board correctly concluded that the Company violated Sections 8(a)(1) and (3) of the Act by disciplining King because the Union had not waived the employees' rights to engage in sympathy strikes.

### III.

■ On review, the Board's factual findings are "conclusive" if they are supported by "substantial evidence on the record as a whole." Section 10(e) of the Act, 29 U.S.C. 160(e). The Board's application of the law to particular facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had it considered the matter *de novo*. *NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991–92, 19 L.Ed.2d 1083 (1968); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951).

■ Section 7 of the NLRA protects the rights of employees to observe lawful picket lines. 29 U.S.C. § 157 (1982). This right, however, may be waived in a collective bargaining agreement. *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006–07, 18 L.Ed.2d 1123 (1967). The waiver of the employees' statutory right must be "clear and unmistakable." *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 697, 103 S.Ct. 1467, 1471, 75 L.Ed.2d 387 (1983); *Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284, 287 (7th Cir.1975), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1976). In this case, the Board found that extrinsic evi-

dence of the parties' bargaining history and past practices under the collective bargaining agreement revealed that the Union had not clearly and unmistakably waived the employees' right to engage in sympathy strikes. We turn now to a review of whether this finding is supported by substantial evidence.

■ We begin by reviewing the Board's finding that extrinsic evidence of the parties' bargaining history reveals that the parties "agreed to disagree" over the scope of the no-strike clause. The no-strike clause in the collective bargaining agreement was originally proposed by the Company in 1972. The record shows that during these initial negotiations the parties engaged in long discussions concerning the provision and the right of employees to engage in sympathy strikes. Relying on the testimony of E.J. Bailey, the Union's International Representative, the Board found that the Company maintained at all times during negotiations that the no-strike clause encompassed all types of strikes whereas the Union insisted that it did not prohibit sympathy strikes. Bailey, whose testimony was credited by the ALJ and accepted by the Board, testified that the parties included the same no-strike clause in each of the successive collective bargaining agreements without acceding to the other's position at any time. As Bailey explained, while "the Company took the position that this [clause] covered all types of ... strikes, or related activities, the Union took the position that this was not necessarily the case, and discussed at length the employees' right to refrain from crossing that picket line, to be in sympathy with the strikers that were manning that picket line." According to Bailey, "the Company never did accede to our argument, nor did we to theirs."

The Board found further evidence that the disagreement over the scope of the no-strike provision continued in later negotiations. During the 1975 negotiations, the Company told the Union that there would be no contract without a no-strike clause that included sympathy strikes to which the Union replied that it would not waive the employees' statutory rights. No changes in the no-strike clause were made. The Board concluded that "[a]t no time did either party acquiesce to the other's view of the matter, nor did the parties change the wording of the no-strike clause."

The Board then addressed what it considered to be "conflicting evidence" in the bargaining history of the parties' intent. In both 1973 and 1975 the Union proposed amendments to the clause to specifically exclude sympathy strikes from the clause's reach. These amendments were rejected by the Company. The Board noted that this "could well be thought to provide probative evidence that sympathy strikes were covered by the no-strike clause *ab initio*." This finding, not surprisingly, is the gravamen of the Company's claim on appeal. IPALCO believes that the withdrawal of these amendments constituted a waiver by the Union of the employees' right to engage in sympathy strikes. The Company bases its waiver argument on the mere fact that the Union made proposals for specific contract language dealing with sympathy strikes to which the Company refused to agree. The Board, however, properly rejected the Company's claim because it believed that these actions were inconclusive since they could also be interpreted as evidence of the parties' continuing disagreement over the scope of the no-strike clause. Moreover, although it is undisputed that in 1973 and 1975 the Union made proposals dealing directly and indirectly with the right to participate in sympathy strikes, the law is clear that the Union did not waive its statutory rights through the mere act of unsuccessfully seeking contractual rights which parallel statutory rights. *Chevron, USA, Inc.*, 244 NLRB 1081 (1979). In fact, the Company's argument is rebutted by the testimony of the Union's business manager who testified that the amendments were proposed "to clarify what we thought we already had." Thus, the Union's proposals in 1973 and 1975 apparently were not attempts to secure new and additional rights for the employees or to carve out exceptions to the no-strike provision, but merely to clarify rights they thought that they already had. The Board's finding that the

Union's attempt to amend the no-strike clause was further evidence of the parties' agreement to disagree over the scope of the clause is well supported by the evidence.

Both the Company and Amicus take issue with the Board's finding of an "agreement to disagree." They argue that by not expressly including sympathy strikes within the scope of the no-strike clause, the parties were simply agreeing to leave the issue of sympathy strikes for resolution by a neutral tribunal (such as this Court or an arbitrator) at later time. They contend that this agreement to defer the interpretation of the breadth of the no-strike clause constitutes a clear and unmistakable waiver by the Union of the employees' statutory right. A brief cursory examination of this contention, however, reveals that its reasoning is seriously flawed. Indeed, its starting premise is that the parties did not agree on the scope of the no-strike clause. In essence, this is a concession by the Company that it hoped to obtain from a third party what it sought but was unable to obtain from the Union at the bargaining table, namely, the right to engage in sympathy strikes. An agreement to leave the interpretation of the clause for a court or arbitrator at a later time does not support a conclusion of waiver, and certainly such an agreement does not rise to the level of a clear and unmistakable waiver of a statutory right. *See Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983). At face value, this argument must properly be read as support for the Board's conclusion that the extrinsic evidence of the parties' intent reveals that the parties agreed to disagree.

The Board also found that the extrinsic evidence of the parties' past practices under the agreement was insufficient to demonstrate a waiver of the statutory right. The Board noted that while prior to 1983 the Company did not require employees to cross picket lines or threaten them with discipline for refusing to do so, on several occasions employees did obey direct orders to cross picket lines. From this conflicting evidence the Board concluded that the extrinsic evidence of the parties' past practic-

es was "uncertain and inconclusive" and thus "insufficient to demonstrate a mutual intent to treat sympathy strikes at a customer's premises as falling either within or outside the scope of the no-strike clause." We believe that this conclusion is well-reasoned and is supported by substantial evidence.

The Company argues that the Union has waived the right to engage in sympathy strikes because on several occasions it acquiesced to its demands that the employees cross a picket line. More precisely, the Company finds waiver through the Union's actions in 1978 and 1979 when it twice acceded to Company demands and ordered its employees to cross picket lines on the Company's premises. The Board found, and we agree, that such actions did not constitute a waiver because the Union's actions were based on its belief that the collective bargaining agreement prohibited the employees from joining a strike against the Company. Certainly the Union is entitled to make a policy decision that it will not honor such lines without waiving its rights to honor picket lines in other circumstances. The evidence shows that the Union has consistently taken the position that, absent emergencies, employees are entitled to honor picket lines directed at entities other than the Company—a policy wholly consistent with their interpretation of the collective bargaining agreement and their account of the bargaining history. The Company's position is further weakened by evidence that it disingenuously fails to address in its brief: prior to 1983 the Company did not require employees to cross picket lines and did not discipline them when they refused to do so but instead accommodated them by permitting them to postpone the work. Several employees testified before the ALJ that they had repeatedly refused to cross picket lines in the past and had never been disciplined for their actions. Indeed, the day before King refused to cross a picket line, another Union employee refused to cross a picket line, notified the Company of his refusal and was never disciplined. As the ALJ found:

[A] number of employees credibly testified ... that prior to 1983 they were not required by the employer to cross picket lines at the premises of customers. They were not threatened with discipline. And, Company director Adams acknowledged that "there may have been times maybe that we did not cross the picket line on the first encounter, but usually the men would either try to work later in the day or we'd try to pick it up the next day."

Finally, the Company contends that the Union waived the employees' sympathy strike rights when the Union failed to object when the Company disciplined Union members in an incident in 1974 for their refusal to cross a picket line on a customer's property. However, the record shows that the Company later admitted that the employees were disciplined for their refusal to work rather than for any refusal to cross a picket line. The Company supervisor "didn't feel that there was a picket on job site ... he felt that he had to take disciplinary action in response to the men's refusal to work." In any event, it is difficult to comprehend how the Company's actions involving one incident during the parties' relationship constitute a clear and unmistakable waiver, especially when there is ample evidence that the Company failed on numerous occasions to discipline in similar situations.

■ The Board fully and carefully considered evidence of the parties' past practices under the collective bargaining agreement but reasonably "hesitated to draw any firm conclusions from this evidence." We agree with the conclusion of the Board that "the evidence ... is insufficient to demonstrate a mutual intent to treat sympathy strikes as a customer's premises as falling either within or outside the scope of the no-strike clause." In sum, we believe the Board's finding that the Company violated Sections 8(a)(1) and (3) of the NLRA by disciplining King because the Union did not waive the right of the employees to engage in sympathy strikes is supported by substantial evidence. Accordingly, we grant enforcement.

MANION, Circuit Judge, concurring.

I agree that the District of Columbia Circuit's opinion on the original petition for review controls the law of this case. However, I take exception to the majority's dictum that "the *Indianapolis Power II* rule is reasonable and consistent with the [National Labor Relations] Act." Maj. opn. at 529. Rather, since this rule evolved from an unusual zig-zag through the NLRB, the D.C. Circuit and this circuit, I would confine the rule to this case. In most circumstances, extrinsic evidence should not override what is the collective bargaining agreement's clear meaning— "the literal, all-encompassing language of the parties' own agreement."

We have only one agreement before us, and that agreement waived all strikes. Under *United States Steel Corp. v. NLRB*, 711 F.2d 772 (7th Cir.1983), such a broad no-strike agreement waives the right to engage in sympathy strikes. As the extrinsic evidence shows, the parties here have a disagreement on sympathy strikes. They probably have many other disagreements. If disagreements are going to be enforced the parties should have a written "agreement to disagree" added to the already plain language of the contract. Without such language, a party, in this case the Union, will be encouraged not to agree in writing and instead invoke someone's reflections on negotiations to fill in the gaps or to otherwise enlarge or diminish a written provision in a collective bargaining agreement.

Substantial evidence supported the conclusion that evidence of past practice was "uncertain and inconclusive" and thus "insufficient to demonstrate a mutual intent." The law of the case preordains the outcome here, but in the interest of collective bargaining, *Indianapolis Power II* should be Indianapolis Power Last.